**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| )<br>)<br>HOMES DEVELOPMENT )<br>CORP., a Massachusetts )<br>corporation; and 1031 REALTY TRUST, )<br>LLC, a Massachusetts limited liability )<br>company )<br>)<br>*Plaintiffs* )<br>)<br>v.   EDMUND & WHEELER, INC., a )<br>New Hampshire corporation; )<br>EDMUND & WHEELER EXCHANGE )<br>SERVICES, LLC, a New Hampshire )<br>limited liability company; JOHN D. )<br>HAMRICK, an individual; MARY )<br>O' TOOLE, an individual; TIMOTHY )<br>BURGER, an individual; and CHRIS )<br>BROWN, an individual )<br>*Defendants* ) | CASE NO.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1.      Plaintiff, Homes Development Corp., (Hereinafter "HDC") is a Massachusetts corporation in the business of  residential homebuilding with a mailing address of 23 Adams St. #A, Burlington, MA 01803.  John Esserian ("Esserian"), is the President of HDC.

2.      Plaintiff, 1031 Realty Trust, LLC is a Massachusetts limited liability company with a mailing address of 23 Adams St. #A, Burlington, MA 01803.  ("HDC" and 1031 Realty Trust, LLC are collectively referred to as "Plaintiffs"). John Esserian , the sole Member of 1031 Realty Trust, LLC, is a resident of Massachusetts with an address of 7 Wisteria Lane, Lexington, MA 02420.

3.       Defendants, Edmund & Wheeler, Inc. and Edmund & Wheeler Exchange Services, LLC, (hereinafter "EWI") are respectively a New Hampshire corporation and a New Hampshire limited liability company, with the same business address of 461 Main St., Ste. 3 Rivagale Bldg., Franconia, New Hampshire, 03580. These entities also share officers or members. Defendant John D. Hamrick is a Manager/Member of  Edmund & Wheeler Exchange Services, LLC and the Vice President and Director of Edmund & Wheeler, Inc. Defendant Mary O'Toole is a Manager of Edmund & Wheeler Exchange Services, LLC and the President and Operations Manager of Edmund & Wheeler, Inc. On information and belief, both John D. Hamrick and Mary O'Toole reside at 1316 Profile Road, Franconia, NH 03580. EWI purports to be one of the nation's premier Section 1031 consulting firms with 35 years of exchange experience.

4.       Defendant John D. Hamrick ("Hamrick") is an individual and resident of New Hampshire, with an address of 1316 Profile Road, Franconia, NH 03580, on information and belief. Hamrick has been a Vice President of EWI from 2000 to the present.

5.       Defendant Mary O'Toole ("O'Toole") is an individual and resident of New Hampshire with an address of 1316 Profile Road, Franconia, NH 03580, on information and belief. O'Toole has been the President, Operations Manager and managing broker of EWI from at least 2015 to the present.

6.       Defendant Timothy Burger ("Burger") is an individual and resident of New Hampshire with an address of 517 Sunset Hill Road, Sugar Hill, NH 03586, on information and belief. Burger has been a 1031 Exchange advisor at EWI from at least 2013 to the present.

7.      Defendant Chris Brown ("Brown") is an individual and resident of Vermont. Brown and has been  a 1031 Exchange advisor at EWI of  Franconia, New Hampshire from at least 2013 to the present.

## JURISDICTION AND VENUE

8.      This  court has jurisdiction under 28 USC § 1332 based on diversity because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

9.      This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 including Plaintiff's claims that arise under the laws of the State of New Hampshire, the State of Massachusetts, the State of Alabama, and the State of Kansas.

10.     Venue is proper before this court pursuant to 28 U.S.C. § 1391 as a substantial part of the acts or omissions of Defendants giving rise to this complaint occurred within this judicial district.  Furthermore, this court has personal jurisdiction over all Defendants.

11.     This Court has general personal jurisdiction over the Defendant corporation, as Edmund & Wheeler, Inc. is a New Hampshire corporation which operates out of a business location in Franconia, New Hampshire.

12.     This Court has general personal jurisdiction over the Defendant limited liability company as  Edmund & Wheeler Exchange Services, LLC is a New Hampshire limited liability company which operates out of a business location in Franconia, New Hampshire. Its members, Hamrick and O'Toole are residents and/or domiciled in New Hampshire.

13.     This Court has general personal jurisdiction over individual Defendants Hamrick, O'Toole, and Burger because these Defendants are residents and/or domiciled in New Hampshire.

14.      This Court has personal jurisdiction over individual Defendants Hamrick, O'Toole, Brown, and Burger because Defendants committed tortious acts in the State of New Hampshire stemming from, *inter alia*, conspiracy and negligent, reckless and or intentional misrepresentations made to induce Plaintiffs to invest over $5 million causing substantial damages to Plaintiffs.

15.      Accordingly, this Court has personal jurisdiction over Defendants sufficient to satisfy Constitutional due process because each Defendant has sufficient minimum contacts with the State of New Hampshire with respect to the subject matter of this action, such that each could reasonably anticipate being hauled into court in this forum.

## STATEMENT OF FACTS

16.      This action involves a scheme whereby Defendants lured HDC into unsuitable investments by negligently, recklessly or knowingly misrepresenting the financial viability and track record of the investment opportunities; negligently, knowingly or recklessly misrepresenting the investments as suitable for HDC's intended short term investment; negligently, recklessly or knowingly misrepresenting the nature of Defendants' role in the transactions; and failing to disclose any commissions earned on HDC's investments when, on information and belief, Defendants earned commissions between 3-6%.

17.      Defendant EWI is a 1031 exchange consulting firm. EWI acted as Qualified Intermediary ("QI") for real estate investors through the 1031 exchange process. EWI and the individual Defendants, as employees and agents of EWI, induced HDC to make unsuitable investments as part of an intended  1031 exchange -- a reference to Section 1031 of the Internal Revenue Code. Section 1031 allows individuals who have earned capital gains from the sale of

real estate to legally defer paying federal taxes on those capital gains when they are re-invested in a qualifying property.

18.     Together with Utah companies Rockwell Debt Free Properties, Inc, Rockwell Birmingham LLC, and Rockwell TIC, Inc (hereinafter collectively referred to as "Rockwell") and now-defunct event venue operator, Noah Corporation, Noah Operations Hoover, AL, LLC, and Noah Operations Overland Park, KS, LLC (hereafter collectively referred to as "Noah") Defendants conspired to sell Tenants in Common ("TIC") interests in real estate, supposedly improved by a building, which was to be occupied and operated by a tenant, Noah, who was represented to be an independent third-party entity. Noah was to lease the space from the TIC owners and operate an event venue in the building. While HDC believed Defendants were performing an independent role as QI, Defendants' role in the scheme was to act as finders or feeders for Rockwell and Noah to steer 1031 exchange investors to the Rockwell investments for the payment of commissions and fees.

19.     John Hamrick ("Hamrick") has been a Vice President of EWI from 2000 to the present and  has at all material times been a licensed New Hampshire real estate professional and QI advisor, among other things, to 1031 investors.

20.     Defendant Mary O'Toole ("O'Toole") has been the President, Operations Manager and managing broker of EWI from at least 2015 to the present. O'Toole has been at all material times a licensed New Hampshire Real Estate Broker, Realtor, and Certified Buyer Representative(CBR). Upon information and belief, O'Toole lives with Hamrick at 1316 Profile Road, Franconia, NH 03580 and has been held out  to be  Hamrick's "life partner on the E & W website.

21.      Defendant Timothy Burger ("Burger") has been a 1031 Exchange advisor at EWI from at least 2013 to the present.

22.      Defendant Chris Brown ("Brown") has been a 1031 Exchange advisor at EWI from at least 2013 to the present.

23.      Plaintiff, Homes Development Corp., ("HDC") had used EWI and its agents and employees for QI services to facilitate a 1031 exchange twice before in or around 2014 and 2015 and had come to rely on EWI and Hamrick, O'Toole, Burger, and Brown as professionals with a fiduciary duty to act in its best interests.

*Purchase of Noah's Birmingham*

24.      In or around March 2016, HDC sought EWI's assistance with another 1031 exchange.

25.      Beginning in or around May 2, 2016, EWI began acting as a QI and advisor for HDC and later 1031 Realty Trust, LLC, facilitating a 1031 Exchange for the sale of HDC's real property located at 18 Victory Garden Way, Lexington, MA ("18 Victory Garden Way"). Hamrick, Burger, and O'Toole individually and as agents and employees of EWI provided advisory services on this exchange. For its services, EWI was to be paid $2,000.00 in total exchange fees: $1,000.00 as an initial fee and $1,000.00 as the final fee at time of closing on the replacement property. None of the Defendants disclosed any commission payments paid on the plaintiffs' purchase of exchange real estate. In fact, when John Esserian ("Esserian"), President of HDC, asked Hamrick how he made what appeared to be a substantial amount of money based on these fees, Hamrick represented merely that he did a high volume of these exchanges.

26.      As part of the 1031 exchange process, HDC had to identify three potential replacement properties within 45 days of the sale of 18 Victory Garden Way and to close on the

purchase of a "like-kind" replacement property within 180 days, meaning a property of the same nature, character or class. HDC identified several local properties HDC had been attempting to purchase. Hamrick introduced HDC to another potential replacement property: real estate located at 2025 International Park Lane, Birmingham, Alabama ("Noah's Birmingham")[1].

27.      Hamrick represented to HDC that Noah's Birmingham was an event center owned by Utah company, Rockwell Birmingham LLC ("Rockwell"). Hamrick told HDC it would purchase an undivided Tenant-in-Common ("TIC") interest in the real property, bundled with a long-term lease of the property to Noah Operations Hoover, AL, LLC (Noah), who would operate the event center. Hamrick represented that Noah was an expert in the field, supposedly committed to the success of the venture with a lengthy history of stable profitability. Hamrick represented that Noah operated many similar event centers around the country, that each event center was a financially separate and independent investment, and that these investments had a solid track record of returns. Hamrick promised HDC annual returns beginning at seven (7) percent per annum with a 2% annual increase.

28.      Hamrick presented HDC with a sales package for Noah's Birmingham, containing beautiful photographs of the exterior and interior of what appeared to be a completed event center. The Sales Package for Noah's Birmingham, provided to HDC by Hamrick, is attached hereto as **Exhibit A**. In addition to photographs representing a fully constructed event center, the sales package reads: "This attractive 8,000 square foot building sits on a large 5.2-acre parcel of land in the fast-growing community of Birmingham, AL." See Exhibit A.

29.      The tenant, Noah, was already in possession of the property, as its lease began on or around June 1, 2016. Accordingly, HDC was promised full rents immediately upon purchase.

_____

[1] Documents and correspondence relating to Noah's Birmingham sometimes refer to Hoover, AL instead of Birmingham, AL. Hoover, AL is a city adjoining Birmingham, AL.

30.     However, upon information and belief, construction did not even actually begin on Noah's Birmingham until in or around October 2016. It had not, in any event, been completed to the extent represented in Exhibit A.

31.     When HDC's preferred replacement properties did not become available within the 180-day closing window, Esserian asked Hamrick whether the Noah's Birmingham investment would be suitable as a short-term investment, and whether HDC could sell it quickly when a preferable replacement property became available, in a separate 1031 exchange. Hamrick assured Esserian this TIC investment was a suitable short-term investment and that that he could exchange out of any fraction at any time.

32.     Hamrick contacted HDC multiple times about Noah's Birmingham, representing that Noah properties had been selling out very quickly and that Noah's business model was "working perfectly."

33.     In or around October 19, 2016, HDC, using EWI as QI, closed on the purchase of a 46.58% TIC share of Noah's Birmingham for the price of $2,678,309.09.   EWI and its employees and agents failed to disclose any commission payments related to  this purchase, and no commission paid to Defendants was disclosed on any Settlement Statement.

34.     Following the purchase of Noah's Birmingham, Rockwell made the first rent payment directly to HDC.  HDC then received monthly rents of approximately $15,586.68 on behalf of Noah through its property administrator LeFevre Management, Inc. d/b/a Cadence Property Advisors (hereinafter referred to as "Cadence") through February 2019. Cadence also provided monthly rent statements to TIC owners. None of the these initial monthly rent statements evidenced any issue with the properties, including any misappropriation of  funds or the payment of undisclosed commissions.

35.     As early as Dec 27, 2016, HDC  expressed to Hamrick a desire to sell its interest in Noah's Birmingham. HDC wished to locate a local "brick and mortar" investment property to replace HDC's Noah TIC investments. However, HDC was unable to find a suitable replacement property that would qualify for exchange under the 1031 structure. As Noah's Birmingham was paying HDC  monthly returns as promised, HDC was not aware of any reason to rush getting out of this investment. HDC, on the advice of Hamrick, chose to hold on to its interest in Noah's Birmingham until locating a preferable investment property that would qualify for a 1031 exchange.

36.     On or about November 15, 2017, with the knowledge of EWI and at least Hamrick, HDC conveyed its interest in Noah's Birmingham to 1031 Realty Trust, LLC. Both HDC and 1031 Realty Trust, LLC are Massachusetts companies operated by Esserian at the business address of 23 Adams St. #A, Burlington, MA 01803.  (Hereinafter, "HDC" and "1031 Realty Trust, LLC" are collectively referred to as "Plaintiffs").

**Purchase of Noah's Overland Park**

37.     In or around January 25, 2018, EWI acted as QI for HDC in facilitating a 1031 exchange for the sale of HDC's real property located at 20 Victory Garden Way, Lexington, MA ("20 Victory Garden Way"). Hamrick, Burger, and O'Toole individually and as agents and employees of EWI again provided advisory services on this exchange. Once again, for its service EWI was to be paid merely  $2,000.00 in total exchange fees: $1,000.00 as an initial fee and $1,000.00 as the final fee at time of closing on the replacement property. None of the Defendants disclosed any commission on the sales relating to the exchange. As part of the 1031 exchange process, HDC had to identify three potential replacement properties within 45 days of the sale of

the property at 20 Victory Garden Way and to close on the purchase of these properties within 180 days of that sale.

38.     HDC identified several potential replacement properties, and Hamrick introduced HDC to a second Rockwell TIC investment: a Noah event center located at 7341 West 133rd Street, Overland Park, Kansas ("Noah's Overland Park"). Hamrick not only acted as an advisor in the 1031 exchange, but initially suggested this replacement property and ultimately sold HDC on the property by highlighting the respective good qualities of the property and even disparaged alternative properties HDC identified.

39.     A Sales Package for Noah's Overland Park, provided to HDC by Hamrick, is attached hereto as **Exhibit B**.

40.     Esserian once again expressed to Hamrick HDC's intention to hold its interest in the property only until a preferable, local replacement property became available and Hamrick once again assured Esserian this was a suitable short-term investment.

41.     Hamrick represented to Esserian that Noah's Overland Park was an event center owned by Utah company, Rockwell Debt Free Properties ("Rockwell"). HDC was to purchase an undivided TIC interest in the real property, bundled with a long-term lease of the property to Noah Operations Overland Park, KS, LLC (Noah), who would operate the event center.

42.     In or around January 26, 2018, HDC, using EWI as QI, closed on the purchase of a 38.19% TIC share of Noah's Overland Park for the price of $2,387,175.29. EWI and the individual Defendants, as EWI's employees and agents, failed to disclose any commission payments made related to  this purchase, and no commission paid to Defendants was disclosed on any Settlement Statement.

43.       Following the purchase of Noah's Overland Park, HDC received its initial rent of approximately $13,923.31 from Rockwell, then received monthly rents of approximately $13,923.31 on behalf of Noah from Cadence, who also provided monthly rent statements. None of the monthly rent statements evidenced any issue including any misappropriated funds or undisclosed commissions.

44.       HDC was the largest TIC investor in both the Noah's Birmingham and Noah's Overland Park properties. In total, HDC invested over $5 million dollars in the Rockwell/Noah operations.

45.       In or about February 2, 2018, Plaintiffs instructed the property administrator, Cadence, to send the Noah's Birmingham TIC co-owners Plaintiffs' "Notice of Intent to Sell" its TIC interest in Noah's Birmingham. This notice was a prerequisite to selling under the TIC Agreement. Plaintiffs received an offer to buy $300,000.00 of  its TIC interest from a co-owner. Plaintiffs decided not to accept the offer, "after talking with Hamrick" and being reassured on the investment.

46.       In or around early March 2019, Plaintiffs  notified Hamrick to inform him Plaintiffs were working on a deal and would contact him to direct the sale of Plaintiffs' TIC shares.

*Noah Defaults on Rent Payments*

47.       On or around March 9, 2019, Plaintiffs, along with other Noah TIC co-owners, received a letter from Cadence informing them that  Noah's March 2019 rent payments would be delayed. Many subsequent communications from Cadence and the TIC co-owners followed on this subject. Plaintiffs thereafter discovered for the first time the many false representations that had been made to HDC by Defendants to induce them to invest in the Noah's Brimingham and

07760af637c5859b<br>

Noah's Overland Park operations and the Defendants' concerted acts and omissions relating to their undisclosed commissions and loyalties.

48.      Noah failed to complete rent payments in April 2019, and no further rent payments were received for any Noah property.

49.      In or around May 28, 2019, Noah filed Chapter 11 Bankruptcy in Utah at Case #19-23840. In February 2020, the bankruptcy was converted to Chapter 7, and Noah was ordered to relinquish its operations.

50.      In or around September 2, 2020, Rockwell filed Chapter 7 Bankruptcy in Utah at Case #20-25326.

51.      Plaintiffs never realized the promised benefits of its TIC investments because, among other reasons, Noah and Rockwell had misappropriated money from Plaintiffs' investments. On information and belief, after HDC purchased its TIC interest in Noah's Birmingham and Noah's Overland Park, Noah's President, William "Bil" Bowser ("Bowser") and others misappropriated some or all of the funds collected from HDC and other investors, among other things, for operations, to pay debts, and to be used by Bowser's construction company, Gabriel Management Corporation ("Gabriel Construction") to complete construction on other Rockwell properties.

***The Defendants Knew or Were Negligent and/or Reckless in not Knowing the Failures of the Noah and Rockwell Business Model and the Unsuitability of the Investment for Plaintiffs***

52.      Upon information and belief, Defendants knew or were negligent and/or reckless in not knowing the failures of the Rockwell and Noah business model. In pitching Noah's Birmingham TIC to HDC, Hamrick told HDC that "Edmund & Wheeler, Inc. in collaboration with Rockwell has used this strategy many times over the years very successfully." On information and belief, EWI had a relationship with Rockwell and Noah's at least as far back as

2013. Hamrick represented to HDC that he had been working with Rockwell at least as far back as 2008. On information and belief, Hamrick's relationship with Rockwell was one of a finder or feeder, and Hamrick referred many of his 1031 exchange clients to Rockwell and Noah. On information and belief, Hamrick travelled to annual meetings with Rockwell and Noah at a Noah event center in Arizona and attended Rockwell Christmas parties in Utah.

53.     Noah's Birmingham and Noah's Overland Park paid steady returns, as "rents" to Plaintiffs from October 2016 and January 2018 through February 2019, respectively. Upon information and belief, these returns were not on the basis of successful management and profitability of each facility, as represented by Defendants, but through cash generated by new investments or cash generated from other facilities. These facts were not disclosed to Plaintiffs. This structure, in which the investor returns are financed not by the success of the business, but with money acquired from later investors, is a "Ponzi" scheme by definition. Upon information and belief, Defendants negligently, recklessly and/or knowingly concealed these known failures of Noah and Rockwell from Plaintiffs.

54.     Contrary to the representations made by Defendants to HDC, the actual property value of Noah's Birmingham and Noah's Overland Park was far below the price at which it was marketed and sold to HDC. Upon information and belief, the actual value of the real estate at Noah's Birmingham and Noah's Overland Park was grossly and falsely inflated to lure investors to fund Rockwell and Noah's business ventures. Upon information and belief, Defendants knew or were negligent and/or reckless in not knowing that the value of Noah's Birmingham and Noah's Overland Park was far below the price at which it was sold to HDC. Contrary to the assurances of Hamrick, Plaintiffs were not able to find a buyer willing to purchase his interest in

the TIC investment at or near its purchased value, nor were Plaintiffs able to find a replacement

tenant to fill Noah's lease.

55.        As a result of the misappropriation facilitated and concealed by the Defendants,

Plaintiffs suffered nearly $3.5 million in damages from loss of investment principal alone. Due

to Defendants' concealing or failing to disclose Rockwell and Noah's mismanagement and the

falsely inflated property value at the time of its purchase, Plaintiffs sold its interest in each Noah's

property at a substantial loss:

> a.   In or around June 30, 2020, HDC sold its interest in Noah's Overland Park for a
>       mere $859,275.00.
>
> b.   In or around January 12, 2021, 1031 Realty Trust, LLC sold its interest in Noah's
>       Birmingham for a mere $768,570.00.

56.        Plaintiffs have also suffered additional losses arising from unpaid monthly "base

rents" or distributions due on its investments.

57.        Plaintiffs have also suffered losses arising from the lost market gains that would

have been realizable from a well-managed portfolio.

58.        Plaintiffs also face potential tax-related losses.

***The Defendants Induced Investors to Purchase Unsuitable Rockwell TIC Interests***

59.        Upon information and belief, at all material times, Hamrick, O'Toole, Brown,

Burger, Bowser, and Scott LeFevre ("LeFevre"), President of Cadence, and Christopher Ashby

("Ashby"), President of Rockwell were close business associates, two or more of whom worked

together in concert to promote this Ponzi scheme.

60.        On information and belief, from approximately 2015, Hamrick, O'Toole, Brown,

Burger, Bowser, LeFevre, and Ashby negligently, recklessly, or fraudulently induced investors

to purchase TIC investments at a grossly inflated price through marketing TIC interests in commercial properties located throughout the United States. The securities were sold through packages of sales documents, financial calculators demonstrating return rates, and utilized finders such as Hamrick, Brown, and Burger at EWI.  Under the scheme, Ashby, Hamrick, Burger, and Brown made misleading representations and material omissions designed to create the appearance that the commercial properties were capable of generating sufficient revenue to service annual base rents around $402,301 (Birmingham) and $437,500 (Overland Park) secured by Noah and to provide a return on a $5,862,086 (Birmingham) and $6,375,086 (Overland Park) equity investment in the range of 7.00% to 10.20% over the course of twenty years.

61.     However, based on their experience operating or working with Noah over the previous several years with access to operational and financial performance information, Defendants knew or were negligent and/or reckless in not knowing that Noah was not capable of generating sufficient revenue to service the rent, let alone provide the promised 2% annual increases bringing the rents between 7.00% to 10.20% on a $5,862,086 and $6,375,086 investment. In addition, Defendants knew or were negligent and/or reckless in not knowing that the "rent" paid to one investor was frequently funded through funds received from investors in other TIC interests.  Armed with this knowledge, Defendants systematically and deliberately made material misrepresentations and omitted material facts in an effort to sell TIC interests to 1031 investors, like HDC, in breach of applicable fiduciary duties.

62.     Sales materials, which upon information and belief were prepared, provided, and disseminated by Defendants, presented, falsely, that the return was solely dependent on the performance of the specific event venue in which HDC would invest. The sales materials further represented that other event venues have demonstrated an ability to generate revenue with "less

than 6% of their current sales as a receivable."   In addition, the offering package stated that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels." These statements were false and were made by Defendants who knew or were negligent and/or reckless in not knowing that they were false.  See Exhibits A and B.

63.     HDC was induced to purchase the TIC investments by EWI and Hamrick and Burger, as employees and agents of EWI. These Defendants negligently, recklessly and or knowingly, made false and misleading representations or omitted information concerning the actual value of the TIC interests, the historical operating experience of the Noah's event venues, and the nature of the risk associated with the TIC securities.  This information was material to Plaintiff's decisions to invest. HDC relied upon the representations of Hamrick and Burger, and the Sales Packages prepared and disseminated by Defendants in deciding to invest in the TIC Interests and would not have invested in the TIC Interests had the Defendants fully and accurately disclosed the true facts and risk factors relevant to the investment.

64.     On information and belief, Hamrick misrepresented the commissions he earned on the sale of TIC interest. However, Hamrick actively induced HDC and other investors to purchase interest in Rockwell properties by recommending TIC interests, liaising between Rockwell and investors, rather than solely acting as QI. In many of his interactions with HDC, Hamrick made both false and misleading statements intended to induce purchase of a TIC interest in Noah's Birmingham and Noah's Overland Park. While HDC believed Defendants were acting solely as QI in its 1031 exchange, Defendants were truly acting as finders or feeders for Noah and Rockwell to steer investors to the Rockwell investments. Defendants advertised the property with no closing costs and did not disclose any commissions or fees other than EWI's $2,000.00

1031 exchange fee. When Esserian asked Hamrick how he made what appeared to be a large amount of money given that EWI charged only $2,000.00 as an exchange fee, Hamrick did not disclose that he made commissions on 1031 exchanges, nor that he was seeking any commission on HDC's 1031 exchange – he merely stated that he did a high-volume of 1031 exchanges. However, on information and belief, Rockwell paid finders such as Hamrick commissions based on referral agreements ranging from 3-6% of the sales price, which could increase depending on volume. Information regarding Hamrick's conflict of interest would have been material to HDC's decisions to invest in a Rockwell property, yet none of this was disclosed to Plaintiff.

65.     Hamrick and Burger communicated with HDC on multiple occasions. During these communications, Hamrick and Burger reinforced the misrepresentations contained in the sales materials and/or made by Defendants in pitching the sale of the TIC securities. When these representations were made, Defendants knew or were negligent and reckless in not knowing that they were false. In particular, Defendants knew or were negligent and/or reckless in not knowing that profits or rent paid to investors did not come from the profits or escrowed funds relating to the event facility in which the investment was made, but instead came from other sources. In addition, on information and belief, Defendants concealed from HDC that 3-6% of the funds invested by HDC were skimmed off the top as "commissions," and the bulk of the remaining funds were diverted to other operations by Noah.

66.     Hamrick and  EWI made the following representations to HDC, all of which were false or misleading:

> a.  EWI was paid merely $2,000.00 per 1031 exchange, and Hamrick made his money due to a high volume of exchanges: On information and belief, Rockwell

paid to and or for the benefit of Hamrick, O'Toole, and/or EWI 3-6% commissions on the sale price of these TIC interests.

b.  <u>Noah would meet HDC's needs as a suitable short-term investment</u>: Contrary to Hamrick's and EWI's representations, Noah was not a suitable short-term investment.  Under the TIC agreements, Plaintiffs were required to offer their interests to the TIC co-owners prior to selling. Additionally, the value of the investments was artificially inflated, so Plaintiffs were unable to sell their interest at or near the investment value after the collapse of Noah.

c.  <u>Noah Leases are all "corporately guaranteed"</u>: When Noah failed to pay under its lease, there was no effective remedy for investors when  both Noah (and its various LLCs under which it did business )  and Rockwell filed for bankruptcy.

d.  <u>The event venues were run as financially separate entities</u>: Hamrick and EWI knew or were reckless in not knowing that Noah was not capable of generating sufficient revenue to service the rent, and that returns were not on the basis of successful management and profitability of each facility, but through cash generated by new investments or cash generated from other facilities.

e.  <u>Noah was committed to the venture  ("Before the first event will occur in this brand new building, Noah's is expected to pre-book approximately $350,000 in future events." *See Exhibit A*.)</u>: On information and belief, Noah locations were not performing as advertised and Noah misappropriated some or all of the funds collected from Plaintiffs and other investors, among other things, for operations, to pay debts, and to complete construction on other Rockwell-Noah properties.

      f.   <u>Noah's Birmingham had already completed an event center  building on the real</u>

         <u>estate as of September 30, 2016 at the time HDC was considering purchase of its</u>

         <u>interest; *See Exhibit A.*</u>: On information and belief, construction was not only not

         completed  but did not even actually begin on Noah's Birmingham until in or after

         October 2016.

      g.   <u>HDC's purchase of each TIC interest in Noah's Birmingham and Noah's Overland</u>

         <u>Park was  eligible for 1031 exchange, and would pass the IRS "smell test"</u>: On

         information and belief, one or both of these transactions qualification   could be

         questionable as "like-kind" exchanges, because the value of the properties as

         purchased was artificially inflated and or because construction on Noah's

         Birmingham not been completed by the close of the 180-day deadline, .

      h.   <u>Hamrick guaranteed HDC annual returns beginning at seven (7) percent per</u>

         <u>annum with a 2% annual increase</u>:  After March 2019, Plaintiffs did not receive

         these promised returns, let alone any annual increase.

67.     On information and belief, commissions paid by Rockwell and/or Noah on Plaintiffs' investments were paid to or for the benefit of Hamrick and O'Toole, including payments made to the John D. Hamrick Revocable Trust and/or  the Mary J. O'Toole Revocable Trust, which on information and belief hold title to 1316 Profile Road, Franconia NH 03580.

68.     EWI, and EWI's employees and agents O'Toole, Hamrick, Burger, and Brown knew or were negligent and/or reckless in not knowing that the Noah investments were not suitable for Plaintiff.  These Defendants concealed or failed to alert Plaintiffs as to the high risk of investment with Noah.

69.     At all relevant times, Hamrick, Burger, Brown, and O'Toole were employees, agents of, and officers of EWI, and by committing the acts described in this Complaint and by failing to act when required to do so, Hamrick, Burger, Brown and O'Toole were acting in the course and within the scope of their authority as employees, agents and officers, and in the transaction of the business of the employment or agency.

70.     Defendants' tortious conduct beginning in at least March 2016 to and after March 2019, as described in this Complaint, was committed within the scope of their employment and in furtherance of their employers' interests.

71.     Defendants' employers are therefore also liable to Plaintiffs for Defendants' acts and omissions as alleged in this Complaint.

## COUNT I
### Negligence Against All Defendants

72.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

73.     EWI and its agents Hamrick, O'Toole, Burger, and Brown owed a duty of care to Plaintiffs to conduct EWI's business and the property transactions in compliance with a 1031 Exchange; to ensure that they were not considered an unqualified person as defined by the Internal Revenue Code; to transfer to First American Title Company ("FATCO") funds for Plaintiffs; to perform due diligence regarding Noah's Birmingham and Noah's Overland Park and ensure that the conveyance was valid; to ensure that a reciprocal trade or actual exchange took place in each exchange transaction; to ensure construction was completed within 180 days; and to acquire Noah's Birmingham and Noah's Overland Park.

74.     Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

20

75.     Defendants breached their duty of care by not acting solely as a qualified intermediary but acting in self-interest at the expense of Plaintiffs. On information and belief, EWI and its agents breached their duty of care by failing to perform the transaction to comply with the requirements of a 1031 Exchange or by failing to make a reciprocal trade or actual exchange; on information and belief, EWI and its agents breached their duty of care by failing to properly transfer funds to FATCO.

76.     As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

**COUNT II**
**Negligent Misrepresentation Against Hamrick, Burger, and EWI**

77.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

78.     Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affect or relate to the nature of the investment and to disclose truthful and complete, rather than misleading, information.

79.     Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

80.     Defendants made false and misleading representations to Plaintiffs.

81.     Defendants knew such representations were false or were negligent in making such representations.

82.     Defendants knew or should have known the misrepresentations were false and knew about the omissions based on their years of experience doing business with Noah and selling TIC interests. Based on that experience, they knew Noah's Birmingham and Noah's

Overland Park were not capable of generating the level of revenue needed in order to pay Plaintiffs' rents.

83.     These Defendants made the misrepresentations in an effort to induce Plaintiffs into purchasing Noah's Birmingham and Noah's Overland Park for a grossly inflated price, and upon information and belief, to earn undisclosed commissions on these sales.

84.     The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiff's evaluation of whether to purchase Noah's Birmingham and Noah's Overland Park. Plaintiffs would not have invested in the TIC interests had it known the true facts.

85.     Plaintiffs reasonably and justifiably relied on the foregoing misrepresentations and on the expectation that information necessary to render representations  as true would not be omitted from each Noah's Sales Packages. The Noah's Birmingham Sales Package and the Noah's Overland Park Sales Package were each presented as an accurate and complete disclosure of facts relating to investment in the TIC Interests and of the risk factors associated with the investment when in fact, they were not

86.     Plaintiffs' reliance was justified in light of the knowledge and experience these Defendants had with respect to Noah, Defendants' representations regarding Noah's track record and potential to generate revenue, Defendants' representations that EWI is one of the nation's premier Section 1031 consulting firms with 35 years of exchange experience, and Plaintiffs' own prior history using EWI for 1031 exchanges.

## <u>COUNT III</u>
### Negligent Hiring/Supervision/Retention Against O'Toole and EWI

87.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

88.     These Defendants had a duty to exercise reasonable care in hiring, supervising, and retaining their employees so as to prevent the foreseeable misconduct of an employee which causes harm to others.

89.     These Defendants knew their employees' propensities and nevertheless hired, retained, and inadequately supervised them.

90.     These Defendants failed to control their employees.

91.     The employees were acting within the scope of their employment at the time of the employees' tortious conduct.

92.     The employees were on these Defendants' premises or using these Defendants' property at the time of the employees' tortious conduct and in furtherance of the tortious conduct.

93.     The employees' wrongful acts were in furtherance of these Defendants' interests and/or at the direction of these Defendants.

94.     The conduct of these Defendants' employees was foreseeable.

95.     As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

<u>**COUNT IV**</u>
**Unjust Enrichment Against All Defendants**

96.     Plaintiffs reallege and incorporate herein by reference, all of the allegations contained in the preceding paragraphs

97.     Plaintiffs conferred a benefit on Defendants by, among other things, providing funds to Defendants for 1031 exchange services and sufficient to complete a real estate transfer for a TIC investment.

98.     On information and belief, Plaintiffs unknowingly conferred a greater benefit on Defendants, who skimmed commissions from its $2,678,309.05 (Noah's Birmingham) and

$2,387,175.29 (Noah's Overland Park) investments in the Noah TIC Interests, apparently in the range of 3-6%.

99.     Defendants appreciated or had the knowledge of the benefit by, among other things, inducing Plaintiffs to make such an investment, accepting funds from Plaintiffs, and, on information and belief, entering into referral agreements with Rockwell without Plaintiff's' knowledge.

100.     It is inequitable for Defendants to retain the benefit of the funds and other benefits conferred on them by Plaintiffs.

101.     Defendants have been unjustly enriched by retaining the benefit without reimbursing Plaintiffs.

102.     As a result of Defendants' unjust enrichment, Plaintiffs are entitled to an amount to be proven at trial.

## COUNT V
### Breach of Fiduciary Duty Against All Defendants

103.      Plaintiffs realleges, and incorporates herein by reference, all of the allegations contained in the preceding paragraphs.

104.      Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiff's benefit.

105.      Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs and Noah's Birmingham and Noah's Overland Park. The TIC investment structure and IRS rules made each of the Plaintiffs a weaker party with unique vulnerabilities, including, inter alia, that Plaintiffs were prohibited from actively managing its investments.

106.      Defendants accepted that trust and confidence from Plaintiffs.

107.      Plaintiffs depended on Defendants' advice that Noah's Birmingham and Noah's Overland Park would be properly managed.

108.      Defendants also had access to superior and exclusive knowledge about Noah that Plaintiffs did not have, such as information about the financial performance of Noah and the flow of funds to and from Noah.

109.      Defendants breached their fiduciary duties to Plaintiffs by concealing and/or failing to alert Plaintiffs to the misappropriation of funds from Noah's Birmingham and Noah's Overland Park.

110.      Defendants' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

**COUNT VI**
**Blue Sky Violations Under Mass. Gen. Laws ch. 110A, § 410**
**Against All Defendants**

111.      Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

112.      Defendants offered to sell Securities to Plaintiff, HDC, in Massachusetts.

113.      Under this state's securities laws, Defendants had a duty to fully and accurately disclose all material facts that a reasonable investor would consider important in making the decision to invest in securities. Instead, Defendants made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading in connection with the offer and sale of securities. Mass. Gen. Laws ch. 110A, § 410.

114.     Each of the Defendants personally participated in the preparation of the Securities Offerings, by either drafting substantial portions of them, reviewing and commenting on them, or personally publishing them, as described more fully above.

115.     Alternatively, Defendants materially aided in the sale of the securities.

116.     Each of the Securities Offerings failed to disclose all material facts that a reasonable investor would consider important in making the decision to invest in the securities, and contained untrue statements of a material fact in violation of Mass. Gen. Laws ch. 110A, §410.

117.     Plaintiffs did not know of these material misstatements or omissions.

118.     Defendants knew, or in the exercise of reasonable care, could have learned of these misstatements or omissions.

119.     As the result of the material misrepresentations and omissions in the above offerings, the investors in such offerings have been damaged.

120.     Each of the Defendants is a partner, officer, or director of the Entities, or occupies a similar status.

121.     In addition, each of the Defendants was employed by the Entities and materially aided the Entities in the sale of the Securities Offerings.

122.     By the nature of their executive positions with each of the Entities, and their active participation in the management of the Entities, Defendants directly or indirectly controlled the Entities.

123.     As such, Defendants are jointly and severally liable for the damages sustained by investors, for the Entities' sale of the Securities Offerings in violation of Mass. Gen. Laws ch. 110A, § 410.

124.     In addition, as a result of their materially aiding the Debtors in the sale of the Securities Offerings, the Defendants are jointly and severally liable for the damages sustained by the Entities' investors in connection with these sales.

125.     Accordingly, Plaintiffs are entitled to an award of damages against the Defendants in the amount of the consideration the  Plaintiffs paid for the security, together with interest, costs, and reasonable attorney fees.

126.     Defendants acted with an actual intent to defraud or in reckless disregard of the truth or falsity of the statements in the above offerings.

127.     Because Defendants' conduct was sufficiently willful and malicious, Plaintiffs are further entitled to an award of punitive damages.

## COUNT VII
### Violation of Real Estate Practice Act Under RSA 331-A Against Hamrick and O'Toole

128.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

129.     Defendants Hamrick and O'Toole are real estate professionals, licensed in the state of New Hampshire.

130.     On EWI's website, Hamrick holds himself out as a licensed New Hampshire real estate professional.

131.     On EWI's website, O'Toole holds herself out as a licensed New Hampshire Real Estate Broker, Realtor, and Certified Buyer Representative.

132.     Hamrick and O'Toole violated their duties under the New Hampshire Real Estate Practice Act, codified at RSA 331-A including but not limited to:

    a.   Failing, as a facilitator, to disclose to the Plaintiffs as prospective buyers material physical, regulatory, mechanical, or on-site environmental conditions affecting the subject property. See RSA 331-A:25-f.

    b.   Failing, as a facilitator, to treat the prospective buyers honestly. See Id.

    c.   In the alternative, acting as an undisclosed dual agent See RSA 331-A:25-d.

    d.   Failing to describe in writing the relationship between the licensee, the seller, and they buyer, to be by all parties to the relationship prior to services being rendered. See RSA 331-A:25-a.

133.    Hamrick and O'Toole engaged in conduct prohibited by the NH Real Estate Practice Act, codified at RSA 331-A:26 including but not limited to:

    a.   Making false statements, descriptions or promises of such character as to reasonably induce any person to act;

    b.   Knowingly committing, or being a party to any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme or device, whereby any other person relies upon the word, representation or conduct of the licensee;

    c.   Conversion of any money, contract, deed, note, mortgage, abstract or other evidence of title, to the licensee's own use, to the use of the licensee's principal, or of any other person.

134.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

### COUNT VIII
### Civil Conspiracy Against All Defendants

135.    Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

136.      Defendants and others known and unknown, knowingly and willfully conspired and agreed among themselves to misappropriate millions of dollars from Noah's Birmingham and Noah's Overland Park, conceal the misappropriation, and/or not inform Plaintiffs about the misappropriation.

137.      The conspiracy's objectives were to convert Plaintiffs' property; breach fiduciary duties of honesty, loyalty, and care owed to Plaintiffs; and to constructively defraud/defraud Plaintiffs.

138.      The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave Defendants undue economic influence and power over Plaintiffs, including the power to exclude and coerce Plaintiffs. Defendants' concerted action and force of numbers also served to unduly coerce and injure Plaintiffs. The conspiracy gave Defendants powers that an individual acting alone would not possess. The civil conspiracy thus constitutes an independent, actionable tort.

139.      Defendants acted wantonly and maliciously towards Plaintiffs by conspiring to steal from Plaintiffs, conspiring to conceal the theft, and/or conspiring to keep silent about the misappropriation so as to keep Plaintiffs from learning about the misappropriation.

140.      In furtherance of the conspiracy, Defendants misappropriated an unknown sum of Defendant's $5 million dollar investment.

141.       Defendants' conduct, as perpetrated through the conspiracy, directly caused injury and damage to Plaintiffs.

142.      As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IX
**Breach of NH Consumer Protection Act Against All Defendants**

143.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

144.     EWI and individual Defendants are persons as defined in NH RSA 358-A:1, I.

145.     Defendants were conducting "trade" and "commerce" as defined in RSA 358-A:1, II providing 1031 exchange services in New Hampshire and marketing those services to consumers at least over the internet via its website.

146.     Defendants' actions and omissions fall within the scope of the New Hampshire Consumer Protection Act in light of the false representations and concealment of facts further detailed above . See RSA 358-A.

147.     Defendants promoted their services as trustworthy and reliable when they were in fact intentionally or recklessly defrauding their clients, in violation of the New Hampshire Consumer Protection Act. See RSA 358-A:2.

148.     Accordingly, Defendants can be held liable for double or treble damages as well as attorneys' fees. See RSA 358-A:10.

## COUNT X
**Aiding and Abetting Against All Defendants**

149.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

150.     Defendants and others known and unknown, knowingly and willfully conspired and agreed among themselves to misappropriate millions of dollars from Noah's Birmingham and Noah's Overland Park, conceal the misappropriation, and/or not inform Plaintiffs about the misappropriation.

151.     The conspiracy's objectives were to convert Plaintiffs' property; breach fiduciary duties of honesty, loyalty, and care owed to Plaintiffs; and to constructively defraud/defraud Plaintiffs.

152.     The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave Defendants undue economic influence and power over Plaintiffs, including the power to exclude and coerce Plaintiffs. Defendants' concerted action and force of numbers also served to unduly coerce and injure Plaintiffs. The conspiracy gave Defendants powers that an individual acting alone would not possess. The civil conspiracy thus constitutes an independent, actionable tort.

153.     Defendants acted wantonly and maliciously towards Plaintiffs by conspiring to steal from Plaintiffs, conspiring to conceal the theft, and/or conspiring to keep silent about the misappropriation so as to keep Plaintiffs from learning about the misappropriation.

154.     In furtherance of the conspiracy, Defendants misappropriated an unknown sum of Plaintiffs' $5 million dollar investment.

155.     Defendants' conduct, as perpetrated through the conspiracy, directly caused injury and damage to Plaintiffs.

156.     As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT XI
### Fraud/Constructive Fraud Against All Defendants

157.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

158.     Defendants made false statements about important facts regarding Noah's Birmingham and Noah's Overland Park, including the representations within the Sales Packages

presented to Plaintiffs and the representations Hamrick and Burger made to each individual Plaintiffs.

159.     Defendants made the statements knowing that they were false.

160.     Alternatively, Defendants made the statements recklessly and without regard for their truth.

161.      Defendants intended that Plaintiffs would rely on the statements.

162.      Plaintiffs reasonably relied on the statements.

163.      As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT XII
## Conversion Against All Defendants

164.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

165.     Beginning in or about May 2016, Defendants wrongfully converted to their own use s all or a portion of the sum of the $5 million that was then Plaintiff's property.

166.     Defendants were obligated to keep intact and deliver the $5 million in converted funds they stole.

167.     The $5 million in converted funds consists of specific money capable of identification.

168.     Defendants had no right to convert the $5 million to their own use.

169.     Plaintiffs have been permanently deprived of the converted funds.

170.     As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT XIII
### Enhanced Compensatory Damages Against All Defendants

171.     Plaintiffs reallege, and incorporate herein by reference, all of the allegations contained in the preceding paragraphs.

172.     The Defendants knowingly funneled the Plaintiffs' investments into a fraudulent scheme with a reckless indifference or disregard of consequences.

173.     On information and belief, the Defendants acted with the concealed motive of collecting referral fees from Rockwell, while purporting to act as an independent fiduciary.

174.     The structure of the TIC investments, combined with limitations imposed by the IRS on managing TIC investments, gave Defendants undue economic influence and power over Plaintiff. The Defendants abused this power to exclude and coerce Plaintiffs.

175.     New Hampshire juries may award enhanced compensatory damages when the defendant's conduct was more probably than not wanton, malicious, or oppressive.

176.     Accordingly, Defendant is liable for enhanced compensatory damages.


## PRAYER FOR RELIEF

WHEREFORE Homes Development Corp. and 1031 Realty Trust, LLC respectfully request that this court:

A.)  Award Plaintiffs damages on all counts in an amount sufficient to compensate Plaintiffs for lost principal, reasonable expected distributions, the lost market gains that would have been realizable  from a well-managed portfolio, and enhanced compensatory damages in an amount to be proven at trial;

B.) The imposition of a constructive trust on the transfers made to and gains realized by Defendants;

C.)  A judgment for unjust enrichment and a judgment ordering disgorgement by the

defendants;

D.)  Award Plaintiffs pre-judgment interest, attorneys' fees, and costs of suit to the

extent allowed by applicable law, pursuant to at least RSA 358-A:10 and Mass.

Gen. Laws ch. 110A ;

E.)  In the event that the 1031 exchanges are deemed to be invalid, for all taxes,

interest, fines and fees caused by Defendants' malfeasance; and

F.)  Such other relief as may be just, equitable and proper.


## JURY DEMAND

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Respectfully submitted,
HOMES DEVELOPMENT CORP.
and
1031 REALTY TRUST, LLC
By and through their attorneys,
HAGE HODES, PROFESSIONAL ASSOCIATION


Date:  _July 27, 2021_____              _____/s/ Jamie N. Hage_____ _____

Jamie N. Hage, Esquire (NHB #1054)
1855 Elm Street
Manchester, New Hampshire 03104
Telephone: (603) 668-2222
jhage@hagehodes.com

Date: __July 27, 2021_____          _____/s/ Douglas J. Miller_____
                                     Douglas J. Miller. Esq. (NHB # 1756)
                                     1855 Elm Street
                                     Manchester, New Hampshire 03104
                                     Telephone: (603) 668-2222
                                     dmiller@hagehodes.com


Date: __July 27, 2021_____          _____/s/ Kirsten J. Allen_____
                                     Kirsten J. Allen, Esq. (NHB # 273661) (petition pending)
                                     1855 Elm Street
                                     Manchester, New Hampshire 03104
                                     Telephone: (603) 668-2222
                                     kallen@hagehodes.com