UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Homes Development Corp.,
and 1031 Realty Trust, LLC,
    Plaintiffs

    v.                          Case No. 21-cv-0633-SM
                                       Opinion No. 2022 DNH 119

Edmund & Wheeler, Inc., Edmund
& Wheeler Exchange Services, LLC,
O'Toole Enterprises, LLC, John D.
Hamrick, Mary O'Toole, Timothy
Burger, and Chris Brown,
    Defendants

## O R D E R

Plaintiffs Homes Development Corp. ("HDC" and 1031 Realty Trust, LLC, filed this action asserting multiple state law claims that arise from two transactions facilitated by defendant Edmund & Wheeler, Inc. in 2016 and 2018. Defendants have moved to dismiss all claims against them. Defendants' motion is granted in part, and denied in part.

## STANDARD OF REVIEW

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010). Although the complaint need only contain "a short and plain statement of the claim showing that the pleader

is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege each of the essential elements of a viable cause of action and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).  In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Instead, the facts alleged in the complaint must, if credited as true, be sufficient to "nudge[ ] [plaintiff's] claims across the line from conceivable to plausible."  Id. at 570.

Generally, a court must decide a motion to dismiss exclusively upon the allegations set forth in the complaint and the documents specifically attached or convert the motion into one for summary judgment.  See Fed. R. Civ. P. 12(2).  There is, however, an exception to that general rule, as "[a] district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'"  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (quoting In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)) (alterations in original).

**BACKGROUND**

Accepting the allegations in plaintiffs' complaint as true, as the court must at this juncture, the relevant facts are as follows.

This case arises from two transactions between the parties known as Section 1031 exchanges. "Section 1031 exchanges take their name from a provision of the federal tax code, 26 U.S.C. § 1031, which allows an owner of investment property to defer paying capital gains taxes upon the sale of the property if the property is 'exchanged' for property 'of like kind.'" U.S. v. Carpenter, 736 F.3d 619, 622 (1st Cir. 2013). "[F]unds from the initial sale may be held temporarily in cash form with no tax penalty as long as they are used to purchase new property within 180 days and as long as the investor designates the replacement property within 45 days." Id. (citing 26 U.S.C. § 1031(a)(3)). Federal regulations require that "the exchangor may not take possession of the funds before purchasing the new property." Id. (citing 26 C.F.R. § 1.1031(k)-1(a)). Accordingly, "exchangors typically rely on 'qualified intermediaries' to hold and invest the funds until the exchange is completed." Id.

Plaintiffs broadly allege that defendants, while acting as plaintiffs' qualified intermediary ("QI") during the Section 1031 exchange process, conspired with Utah companies Rockwell

Debt Free Properties, Inc., Rockwell Birmingham LLC, and

Rockwell TIC, Inc. (collectively "Rockwell"), and now-defunct

event venue operator Noah Corporation, Noah Operations Hoover,

LA, LLC, and Noah Operations Overland Park, KS, LLC,

(collectively "Noah") to sell plaintiffs' real estate interests,

while Rockwell and Noah were using the funds generated from

those real estate transactions to operate an illegitimate Ponzi

scheme.  Plaintiffs believed that defendants were acting

independently as their QI, but say defendants were actually

acting as "finders and feeders" for Noah and Rockwell, working

on Rockwell's behalf to locate potential investors and convince

them to invest in the properties, in return for Rockwell's

payment of commissions and fees.  Compl. ¶ 19.

<u>The Parties</u>

Defendant Edmund & Wheeler, Inc. ("EWI"), is a Section 1031

consulting firm "with over 35 years of exchange experience."

Compl. ¶ 3.  EWI is a New Hampshire corporation.  Defendant Mary

O'Toole is the President, Operations Manager, and managing

broker of EWI.  O'Toole is a licensed real estate broker,

realtor, and certified buyer representative.  Defendant John

Hamrick is EWI's Vice President and Director, and a licensed

real estate professional.  Defendants Timothy Burger and Chris

Brown work for EWI as Section 1031 Exchange advisors.

Defendant Edmund & Wheeler Exchange Services ("EWES"), a New Hampshire limited liability company, is located at the same address as EWI.  EWES is affiliated with Hamrick and O'Toole: Hamrick serves as EWES's Manager/Member, while O'Toole serves as a Manager.  Finally, Hamrick and O'Toole operate O'Toole Enterprises, LLC, a New Hampshire real estate company comprised of real estate agents and brokers.  O'Toole serves as O'Toole Enterprises' principal broker, as a member, and as the company's registered agent.  Hamrick is a licensed real estate agent with the company, and, prior to January, 2021, he served as O'Toole Enterprises' registered agent.

Plaintiff HDC is a Massachusetts corporation in the business of building homes and residential developments. Plaintiff 1031 Realty, a Massachusetts limited liability company, is a real estate investment company.  Plaintiffs share an address; John Esserian serves as HDC's President, and as the sole member of 1031 Realty.

18 Victory Garden 1031 Exchange

In 2014 and 2015 (before the events giving rise to this action), HDC contracted with EWI for the provision of QI services on two separate occasions.  As a result, HDC "had come to rely on EWI" and its employees "as professionals with a fiduciary duty to act in [HDC's] best interests."  Compl. ¶ 25.

In March, 2016, HDC again contracted with EWI for assistance with a Section 1031 exchange involving the sale of property located at 18 Victory Garden Way, Lexington, Massachusetts.  The parties agreed that EWI would be paid $2,000 in total exchange fees: $1,000 as an initial fee, and $1,000 at the time of closing on the replacement property.  Hamrick, Burger, and O'Toole provided HDC with advisory services.

Under the contract between the parties,[1] EWI agreed to serve as QI for the Section 1031 exchange, which meant EWI would "acquire" 18 Victory Garden Way from HDC, "transfer" 18 Victory Garden Way to the purchaser, hold the funds from the sale of 18 Victory Garden Way in escrow, acquire HDC's replacement property, and, finally, transfer the replacement property to HDC.  Defs.' Mot. to Dismiss, Exh. 1.  The contract plainly discloses that EWI "has established business relationships with several companies that provide Replacement Property options for Exchangors which could result in a referral fee being paid to an affiliate of EWI."  Id.  Finally, the contract instructs that

---

[1]    Defendants submitted the 2016 and 2018 Exchange Agreements in support of their motion to dismiss.  Plaintiffs do not dispute their authenticity, and the court may therefore consider the agreements without treating defendants' motion as one for summary judgment under Fed. R. Civ. P. 56.  See Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (courts may properly consider on 12(b)(6) motions "documents the authenticity of which are not disputed by the parties").

HDC should "seek its own legal and accounting advice regarding this transaction," and that:

> the Exchangor acknowledges that Edmund & Wheeler, Inc. has <u>not</u> rendered legal, tax, or accounting advice in this matter, and further agree to hold the said Edmund & Wheeler, Inc., its officers and directors, and John D. Hamrick, Chris Brown, Timothy L. Burger & Mary J. O'Toole <u>harmless and indemnified</u> from any claim from any source arising out of this transaction, except for breach of this agreement.

<u>Id</u>.

Given the Section 1031 exchange rules, HDC had 45-days from the day of the sale of 18 Victory Garden to identify three replacement properties, and 180-days to close on the purchase of a "like-kind" replacement property (a property of the same nature, character, or class).  HDC identified several potential local properties, but Hamrick introduced HDC to another potential replacement property: real estate located at 2025 International Park Lane, Birmingham, Alabama ("Noah's Birmingham").  Noah's Birmingham was an event center owned by Rockwell; HDC could purchase an undivided Tenant-in-Common ("TIC") interest in Noah's Birmingham, bundled with a long-term lease of the property to Noah, which would operate the event center.

Hamrick informed HDC that Noah was "an expert in the field," with regard to operating event centers, and was "committed to the success of the venture with a lengthy history of stable profitability." Compl. ¶ 29. Noah operated several similar event centers around the country, Hamrick said, each of which was a financially separate and independent investment, and, importantly, each of those investments "had a solid track record of returns." Id. "Hamrick promised HDC annual returns beginning at seven percent per annum with a [two percent] annual increase," Compl. ¶ 29, and provided HDC with a Noah's Birmingham sales package that featured "beautiful photographs" of a completed event center, Compl. ¶ 30, and described the event center as an "attractive 8,000 square foot building [sitting] on a large 5.2-acre parcel of land in the fast-growing community of Birmingham, AL." Id. Since Noah was already in possession of the property, HDC was promised full rents immediately upon purchase of the TIC interest. Despite those representations, construction had not actually begun at Noah's Birmingham. Construction did not begin until October of 2016.

HDC's preferred local investment properties were not available within the required 180-day closing window. With that in mind, Esserian asked Hamrick whether Noah's Birmingham would be suitable as a short-term investment, and if HDC would be able

to sell its TIC interest quickly when a preferred local
replacement property became available (in a separate Section
1031 exchange).  Hamrick assured Esserian that the Noah's
investment was a suitable short-term investment, and that HDC's
interest could easily be exchanged out at any time.  Id. at
¶ 33.

Hamrick continued to reach out to HDC to promote Noah's
Birmingham, telling HDC that Noah properties had "been selling
out very quickly, and that Noah's business model was 'working
perfectly.'"  Compl. ¶ 34.  HDC entered into a Purchase and
Sales Agreement ("PSA") with Rockwell on October 10, 2016, for
an undivided 46.58 percent interest in Noah's Birmingham.
Rockwell assigned the PSA to EWI, through Hamrick, to conform
the transaction to Section 1031's requirements.  Burger
initiated a Request and Authorization for Release of Escrow
Funds, signed by Burger and Hamrick.  On October 19, 2016, HDC
(with EWI as QI) closed on the purchase of a 46.58 percent TIC
share of Noah's Birmingham for $2,678,309.09.

On October 10, 2016, following execution of the PSA,
Rockwell transferred funds, "representing a percentage of the
commission earned on the sale" by defendants to O'Toole
Enterprises.  Compl. ¶ 36.  On October 19, 2016, following final

transfer of the purchase price to Rockwell, Rockwell transferred the balance of sales commissions owed to O'Toole Enterprises.

Following its Noah's Birmingham TIC purchase, HDC began receiving monthly rents in the approximate amount of $15,500.00 from Noah's property administrator.

Later that year, on December 27, 2016, HDC contacted Hamrick to discuss selling its interest in Noah's Birmingham, since HDC still hoped to locate a local "brick and mortar" investment property to replace the Noah's investment.  HDC was unable to find a suitable replacement property that would qualify for a Section 1031 exchange.  And, since Noah's Birmingham had been paying HDC monthly returns as expected, HDC did not sell its interest in the property.  Upon Hamrick's advice, HDC maintained its interest in Noah's Birmingham.

On November 15, 2017, with EWI's knowledge, HDC conveyed its interest in Noah's Birmingham to 1031 Realty Trust.

On February 2, 2018, plaintiffs requested that Noah's property administrator inform Noah's Birmingham's TIC co-owners of its "Notice of Intent to Sell" its interest in Noah's Birmingham (notice was a prerequisite to selling an ownership interest under the agreement).  In response, plaintiffs received

an offer from another co-owner to purchase a portion of its TIC
interest for $300,000.  But, after Hamrick reassured plaintiffs
of the stability and profitability of the Noah's Birmingham
investment, plaintiffs decided not to accept the $300,000 offer.

20 Victory Garden Way 1031 Exchange

On January 25, 2018, HDC again contracted with EWI to act
as a QI for a Section 1031 exchange for property located at 20
Victory Garden Way, Lexington, Massachusetts.  Hamrick, Burger,
and O'Toole again provided advisory services to HDC.  EWI and
HDC again agreed that EWI would be paid $2,000 for its services,
$1,000 as an initial fee, and $1,000 as a final fee at the time
of closing on the replacement property.  The contract between
the parties for the 20 Victory Garden Way exchange includes
provisions identical to those in the contract governing the 18
Victory Garden Way exchange.

HDC again identified several potential replacement
properties, but Hamrick suggested a second Rockwell TIC
investment, a Noah event center located at 7341 West 133rd
Street, Overland Park, Kansas ("Noah's Overland Park").  Hamrick
provided HDC with a sales package related to Noah's Overland
Park, and told Esserian that, like Noah's Birmingham, Noah's
Overland Park was an event center owned by Rockwell, from whom
HDC would purchase an undivided TIC interest in the property,

11

bundled with a long-term lease of the property to Noah
Operations Overland Park, KS, LLC, which would operate the event
center.

Hamrick "sold HDC on the [Overland Park] property by
highlighting the respective good qualities of the property and
even disparage[ing] alternative properties HDC identified."
Compl. ¶ 43.  After Esserian told Hamrick that HDC intended to
hold its interest in the Noah's Overland Park property only
until a preferable, local property became available, Hamrick
assured Esserian that Noah's Overland Park, like Noah's
Birmingham, was a suitable short-term investment.

Accordingly, on January 23, 2018, HDC entered into a
Purchase and Sales Agreement with Rockwell for a 38.19 percent
interest in Noah's Overland Park.  HDC and Rockwell assigned the
PSA to EWI to conform to Section 1031's requirements.  Burger
again initiated a Request and Authorization for Release of
Escrow funds, signed by Burger and Hamrick.  On January 26,
2018, HDC, with EWI as QI, closed on the purchase of a 38.19
percent TIC share of Noah's Overland Park for the price of
$2,387,175.29.  Following the purchase, HDC began receiving
monthly rents of approximately $13,900.00 from Noah's property
administrator.  Those payments continued through February, 2019.

On January 26, 2018, Rockwell transferred funds representing a percentage of the commission defendants earned on the sale to O'Toole Enterprises.

The Collapse of Noah and Rockwell

HDC was the largest investor in both Noah's Birmingham and Noah's Overland Park, having invested over $5 million in the two enterprises.

Plaintiffs contacted Hamrick in early March, 2019, to inform him that they intended to sell the entirety of their TIC interests in the Rockwell properties.  But later that month plaintiffs and other Noah TIC co-owners received a letter from Noah's property administrator advising them that Noah's March, 2019, rent payments would be delayed.  Noah stopped making rent payments completely in April, 2019, and, on May 28, 2019, filed for Chapter 11 bankruptcy protection in Utah (later converted to Chapter 7).  On September 2, 2020, Rockwell followed suit, filing for Chapter 7 bankruptcy protection in Utah.

Plaintiffs soon discovered that Noah and Rockwell had been misappropriating money from plaintiffs' investments.  After plaintiffs' TIC purchases, Noah's President William Bowser and others used the misappropriated funds, among other things, to pay operations expenses, to pay Noah's and Rockwell's debts, and

to complete construction on other Rockwell properties.  The
"rents" paid by Noah's Birmingham and Noah's Overland Park to
plaintiffs were not derived from profit generated due to
successful operations of the facilities, but instead consisted
of cash obtained from new investments or diverted from other
Rockwell facilities.  Plaintiffs label the structure – where
"investor returns are financed not by the success of the
business, but with money acquired from later investors" – a
"Ponzi" scheme, a scheme defendants knowingly concealed from
plaintiffs.  Compl. ¶ 61.

As the Ponzi scheme is described, Rockwell associates and
the defendants worked together to induce investors to purchase
TIC investments at grossly inflated prices.  They did so through
misleading representations and material omissions in packages of
sales documents that EWI provided to HDC, as well as in
financial calculations purporting to demonstrate positive rates
of return.  The sales documents and financial calculations
provided to HDC were designed to:

> create the appearance that the commercial properties
> were capable of generating sufficient revenue to
> service annual base rents of around $403,301
> (Birmingham) and $437,500 (Overland Park) secured by
> Noah and to provide a return on a $5,862,086
> (Birmingham) and $6,375,086 (Overland Park) equity
> investment in the range of 7.0 [percent] to 10.20
> [percent] over the course of twenty years.

Compl. ¶ 68.  The materials represented that investment return was dependent on the performance of the specific venue in which HDC would invest, but noted that other Noah venues had generated revenue with "less than [six percent] of their current sales as a receivable."  Compl. ¶ 70.  They further stated that "Noah's anticipates revenues to well exceed the debt service and operating cost with their break-even well below their currently operating occupancy levels."  Id.  Those statements were largely false.

In furtherance of the alleged scheme, Rockwell used finders such as Hamrick, Brown, and Burger.  Plaintiffs say that Hamrick worked as a "finder" or "feeder" for Rockwell, and led several of his Section 1031 exchange clients to Rockwell properties. While pitching the Rockwell investments to HDC, Hamrick informed HDC that EWI "in collaboration with Rockwell, has used this strategy many times over the years very successfully."  Compl. ¶ 60.  Indeed, EWI's relationship with Rockwell and Noah's stretched back several years, to at least 2013, and Hamrick told HDC that he had been working with Rockwell since at least 2008. In fact, Hamrick frequently travelled to Rockwell's and Noah's annual meetings, and he attended Rockwell Christmas parties. Plaintiffs allege that defendants Hamrick, O'Toole, Brown, and

Burger were also close to Bowser, and the Rockwell founders and
owners.

Plaintiffs say that, given the closeness of the
relationship between EWI and Rockwell/Noah, and the defendants
having worked with Rockwell/Noah for several years, defendants
knew (or were negligent in not knowing) that (1) the statements
in the sales packages were false, and (2) neither Noah's
Overland Park nor Noah's Birmingham was capable of generating
revenue sufficient to even service the base rent, let alone
provide the projected two percent annual increases.  Plaintiffs
say that defendants were aware that "rent" paid to one investor
was "frequently funded through funds received from investors in
other TIC interests," but deliberately omitted that fact,
thereby misrepresenting the stability of the investments in
order to sell Section 1031 TIC interests.  Plaintiffs further
allege that, contrary to defendants' representations, the
property value of Noah's Birmingham and Noah's Overland Park was
"falsely inflated to lure investors to fund" Rockwell's and
Noah's ventures, and each value was actually far below the price
at which it was marketed and sold to HDC.  Compl. ¶ 62.
Plaintiffs allege that defendants knew (or were negligent or
reckless in not knowing) that the value of the Noah's Birmingham

and Noah's Overland Park properties were far below the price at
which they were sold to HDC.

In sum, plaintiffs allege, defendants misrepresented the
actual value of Rockwell TIC interests, the historical operating
expenses of Noah's event venues, and the nature of the risk
associated with Rockwell TIC investments.  Hamrick and Burger
misrepresented the suitability of Noah as a short-term
investment; that the Noah leases were "corporately guaranteed;"
that Noah was committed to the venture and was performing as
advertised; that construction on Noah's Birmingham was complete
as of September 30, 2016; and that the Noah event venues were
run as financially separate entities, with returns generated
based on the successful management and profitability of each
facility.  Finally, defendants misrepresented both the
suitability of the TIC interests in a Section 1031 Exchange, and
the potential returns plaintiffs would receive from the Rockwell
investments.

Plaintiffs say that the information provided by defendants
Hamrick and Burger concerning Noah and Rockwell was material to
their decision to invest in the properties, and they relied on
the statements that Hamrick and Burger made (and those in the
Sales Packages) in deciding to invest.  Had defendants fully

disclosed the facts and risks relevant to the investment,
plaintiffs would not have invested in the properties.

Finally, and as mentioned, defendants failed to disclose
their receipt of substantial commissions from Rockwell for the
sale of TIC interests to plaintiffs (commissions which ranged
from three to six percent of the property sales price).  Those
substantial commissions caused Hamrick and EWI to act not in the
best interests of HDC, but in their own conflicting monetary
interest.  That conflict of interest was not disclosed to
plaintiffs.  In fact, when Esserian asked Hamrick

> how he made what appeared to be a large amount of
> money given that EWI charged only $2,000 as an
> exchange fee, Hamrick did not disclose that he made
> commissions on 1031 exchanges, nor that he was seeking
> any commission on HDC's 1031 exchange – he merely
> stated that he did a high-volume of 1031 exchanges.

Compl. ¶ 72.

The Rockwell commissions were paid to O'Toole's separate
company, O'Toole Enterprises.  Plaintiffs allege that due to her
position at EWI, and her status as Hamrick's life partner,
"O'Toole was privy to substantial communications between
Rockwell and [EWI] and had access to information at [EWI]
including financial statements of Noah from which it was clear
that Noah was in poor financial condition."  Compl. ¶ 78.

According to plaintiffs, the business relationship with Rockwell and the Noah TIC program was the "primary source of income for the couple."  Id.

On June 30, 2020, HDC sold its interest in Noah's Overland Park for $859,275, and, on January 12, 2021, 1031 Realty Trust sold its interest in Noah's Birmingham for $768,570.  Plaintiffs suffered a loss of nearly $3.5 million of their total investment.

## DISCUSSION

Defendants support their motion to dismiss with three general arguments.  First, defendants argue that all claims against O'Toole, Burger, Brown, and Edmund & Wheeler Exchange Services ("EWES") should be dismissed, because plaintiffs have not sufficiently alleged particularized facts giving rise to cognizable claims against them.  Defendants next contend that, because the entire complaint sounds in fraud, it should be dismissed for failure to comply with the pleading requirements set out in Fed. R. Civ. P. 9(b).  Finally, defendants argue that all 12 individual claims asserted by the plaintiffs fail to state cognizable claims, and must be dismissed under Fed. R. Civ. P. Rule 12(b)(6).

(1)  Applicability of Rule 9(b)'s Heightened Pleading Standard

Addressing defendants' second argument first, Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  The complaint must, at a minimum, allege "the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated."  Clearview Software Int'l Inc. v. Ware, No. 07-CV-405-JL, 2009 WL 2151017, at *1, n.3 (D.N.H. July 15, 2009) (quotation omitted).  See also Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) ("This heightened pleading standard is satisfied by an averment of the who, what, where, and when of the allegedly false or fraudulent representation.") (citation and internal punctuation omitted).  "[O]ther elements of fraud, such as intent and knowledge, may be averred in general terms."  Rodi, 389 F.3d at 15.

The gravamen of plaintiffs' complaint is that EWI and its employees "fraudulently lured HDC into unsuitable investments through fraud and misrepresentation."  Defs.' Mot. to Dismiss, p. 9.  Thus, defendants argue, Rule 9(b) applies broadly to all of plaintiffs' claims, whether they rest upon a statutory, tort, contractual, or fiduciary basis, and requires that plaintiffs

20

meet its strict pleading standards.  Plaintiffs disagree,
arguing that, in addition to alleging fraud, they have also
alleged that defendants made misrepresentations "negligently,
recklessly, or knowingly."  Pls.' Opp. to Mot. to Dismiss at 17
(quoting Compl. ¶ 17).

"The hallmarks of fraud are misrepresentation or deceit."
Ed Peters Jewelry Co. v. C & J Jewelry Co., 215 F.3d 182, 191
(1st Cir. 2000).  A claim sounds in fraud when fraud "lies at
the core of the action."  Hayduk v. Lanna, 775 F.2d 441, 443
(1st Cir. 1985).  Most of plaintiffs' claims fall into that
category (with the exception of their claims for negligence, and
negligent hiring), and Rule 9(b)'s strict pleading standards
apply.

Defendants argue that plaintiffs' complaint must be
dismissed because its allegations do not satisfy "the time,
place, and content" requirements.  Defs.' Mot. to Dismiss at 10.
Defendants are not entirely wrong – several of plaintiffs'
allegations lack specificity, making it difficult to attribute
particular conduct to an individual defendant.  The majority of
plaintiffs' allegations, however, are sufficiently specific as
to time, place, and content.  When "a claim sounding in fraud
contains a hybrid of allegations, some of which satisfy the
strictures of Rule 9(b) and some of which do not, an inquiring

court may sustain the claim on the basis of those specific allegations that are properly pleaded." Rodi, 389 F.3d at 15-16.

For example, plaintiffs allege that, during the 180-day period between the sale of its 18 Victory Garden Way property and its purchase of a TIC interest in Noah's Birmingham, Hamrick represented that Noah's Overland Park was a suitable short-term investment, that each Noah's event center was a financially separate and independent investment, and that HDC could expect annual returns beginning at seven percent per annum with a two percent annual increase. See Compl. ¶ 29. Plaintiffs also allege that, when Esserian directly questioned Hamrick about how EWI could maintain its profitability when the company only earned a small amount from 1031 exchange fees, Hamrick deliberately failed to disclose that he and O'Toole would receive a commission from Rockwell of three to six percent of the purchase prices on sales to HDC. Compl. ¶ 42. Those allegations are sufficiently specific to satisfy the "time, place, and manner" pleading requirement.

The court notes that plaintiffs' fraud allegations are focused in part on defendants' failure to disclose material information regarding Rockwell and Noah, including: the financial difficulties the companies were facing; that Hamrick

was working as a "finder" for Rockwell and Noah while also under contract to HDC; and that "rents" paid by Noah's Birmingham and Noah's Overland Park were actually derived from other parties' investments in other, purportedly independent, Noah event centers.  As the court noted in DiTucci v. Ashby, No. 2:19-CV-277-TC-PMW, 2020 WL 1249627, at *5 (D. Utah Mar. 16, 2020), (a nearly identical case pending in the District of Utah, and also involving Rockwell, Noah, and EWI), "it is unclear how Plaintiffs could be more specific; because they are alleging that each Defendant failed to make certain disclosures, there is no practical way for Plaintiffs to detail the date or place of conversations that never occurred."

The allegations in plaintiffs' complaint are, at this stage, sufficiently specific to meet Rule 9(b)'s requirements.

Moreover, the complaint sufficiently alleges that defendants had the requisite scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, (1976). As stated, Rule 9(b)'s "specificity requirement extends only to the particulars of the allegedly misleading statement itself." Rodi, 389 F.3d at 15 (citation omitted).  However, the complaint still must "identify[ ] the basis for inferring scienter" by setting forth "specific facts that make it reasonable to believe

that defendant knew that a statement was materially false or misleading." North American Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009) (quotations and citations omitted).

Plaintiffs allege a long-standing, close relationship between Noah, Rockwell, and EWI, and Hamrick. See, e.g., Compl. ¶¶ 67, 60. So close was the relationship that Hamrick attended Rockwell company meetings and Christmas parties. Plaintiffs' scienter contentions are bolstered by their allegations that Hamrick failed to disclose the substantial commission payments he stood to earn from Rockwell in return for arranging HDC's investment in Noah's Birmingham and Noah's Overland Park (despite being directly asked about his compensation by Esserian). See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007) ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference."). Taken together, plaintiffs' allegations are sufficient for pleading purposes to support a reasonable inference that defendants knew their statements concerning Rockwell and Noah were false or materially misleading.

Finally, instead of focusing on the sufficiency of plaintiffs' scienter allegations, defendants' argument is largely focused on their accuracy. For example, defendants say

24

that Hamrick did not mislead Esserian by telling him that EWI

"was profitable while having low fees because of a 'high volume'

of work," rather than disclose the substantial amount he stood

to gain from commissions based on HDC's Rockwell purchases,

since "'high volume' of work is not a false statement regarding

the source of EWI's revenues."  Defs.' Mot. to Dismiss at 12.

Defendants further argue that, despite plaintiffs' allegations

to the contrary, Hamrick believed the statements set forth in

Rockwell's sales documents were accurate.  Such factual

challenges, however, are inappropriate in the context of a

motion to dismiss.  See Cebollero-Bertran v. Puerto Rico

Aqueduct & Sewer Auth., 4 F.4th 63, 69 (1st Cir. 2021) ("Rule

12(b)(6) motions . . . are always facial, not factual,

challenges to the complaint.") (citations omitted).

Defendants' remaining arguments are similarly unpersuasive,

and defendants' contention that the entirety of plaintiffs'

complaint should be dismissed for failure to comply with Rule

9(b)'s requirements is unavailing.  Plaintiffs' complaint sets

forth allegations that are sufficiently particular at this stage

of the litigation.

For similar reasons, defendants' motion to dismiss Count

11, plaintiffs' fraud/constructive fraud claim, for failure to

state a claim is denied.

(2)  <u>Claims against O'Toole, Burger, Brown, and EWES</u>

Defendants argue that plaintiffs' claims against EWES, O'Toole, Burger, and Brown should be dismissed because plaintiffs have not set forth sufficiently particularized allegations in support of the claims against them.  Defendants say that, rather than alleging each defendant's role in the matter, plaintiffs rely instead on impermissible "group pleading," referring to the "defendants" generally, or listing all the defendants without distinguishing between them. Plaintiffs respond that those allegations are permissible because the complaint alleges securities fraud, and the group pleading doctrine applies.

The "group pleading" doctrine allows a plaintiff in a securities action to satisfy fraud pleading requirements by imputing false or misleading statements in a company's group-published SEC public filings, press releases, or other corporate documents to the high-level corporate officers involved in the everyday business of the company.  See <u>In re Raytheon Sec.</u> <u>Litig.</u>, 157 F. Supp. 2d 131, 152 (D. Mass. 2001) ("Under the group-published information doctrine, the plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers."); <u>In re Cabletron</u>

Sys., Inc., 311 F.3d 11, 40 (1st Cir. 2002) ("under the so-called group pleading presumption, the court need not consider the liability of each individual defendant, but may attribute all the statements to all the defendants as 'collective actions.'").  The Court of Appeals for the First Circuit has recognized a "very limited version of the group pleading doctrine for securities fraud" in In re Cabletron Sys., Inc. 311 F.3d at 40, but noted the doctrine's questionable validity following the enactment of the Private Securities Litigation Reform Act of 1995.

Here, however, the doctrine does not apply because plaintiffs fail to allege that the documents at issue – the sales brochures created by Rockwell and Noah's – were published or created by any of the defendants.  Plaintiffs make vague allegations concerning falsities in "other documents," including the Purchase and Sales Agreements, and "documents generated to falsely inflate the returns expected on investments."  But they fail to identify with any degree of specificity the content of the misleading statements in these (largely unidentified) documents.

Plaintiffs' argument also fails because they seek to apply the group pleading doctrine to defendants Brown and Burger. Plaintiffs have not alleged that Brown or Burger served as high-

27

level officers involved in the day-to-day management of the
company.  See In re Lernout & Hauspie Sec. Litig., 208 F. Supp.
2d 74, 84 (D. Mass. 2002) ("To hold defendants responsible for
the group-published information, the plaintiffs must
sufficiently allege that each individual defendant is a clearly
cognizable corporate insider with [an] active daily role in the
relevant companies or transactions.") (quotation and citation
omitted).

For these reasons, the "group pleading doctrine" is
inapplicable.  The court turns now to defendants' motions to
dismiss claims against named defendants.

(a)  Mary O'Toole

Defendants say that plaintiffs' claims against Mary O'Toole
should be dismissed because she acted only as the office
administrator for EWI, was not involved in Section 1031
exchanges, and had no contacts with plaintiffs.  Defendants note
that plaintiffs have not alleged conduct individual to O'Toole,
but instead recite her job titles with EWI and EWE, and allege
that she is a principal broker at O'Toole Enterprises who
resides with and is Hamrick's life partner.  Such allegations,
defendants say, do not support plaintiffs' conclusory statements
that O'Toole provided "advisory services" as part of plaintiffs'

Section 1031 exchange transactions, or was in any way involved in the scheme alleged.

Plaintiffs respond that they have alleged that O'Toole is a director and officer at EWI and EWES, with authority over the other defendants who were directly involved in the fraudulent scheme.  They argue that O'Toole's close personal relationship with Hamrick supports an inference that the two were working together to commit the alleged wrongful acts.  And, plaintiffs say, they have alleged that, as a result of O'Toole's close relationship with the founders of Rockwell, she had access to information contradicting defendants' representations that the Rockwell investments were appropriate, yet failed to provide accurate information to correct those misrepresentations. Plaintiffs further contend that the "use of O'Toole's separate company, O'Toole Enterprises, LLC to receive commissions" from the Rockwell transactions "manifests the Defendants' scheme to hide the payment of commissions from the Plaintiffs."  Pl.'s Opp. to Mot. to Dismiss at 14 (quoting Compl. ¶ 76).  Finally, plaintiffs point out that defendants' argument regarding O'Toole's office administrator status raises a factual issue, since their complaint alleges that she is held out publicly as the President, Operations Manager, and Managing Broker of EWI, as well as the principal of O'Toole Enterprises.  At this stage

of the litigation, plaintiffs say, the factual allegations of the complaint must be taken as true.

While it is a close call, plaintiffs have plausibly – albeit barely – alleged O'Toole's personal participation in defendants' purported scheme.  Plaintiffs allege that O'Toole served as the President and managing broker of EWI (Compl. ¶ 21), provided plaintiffs with advisory services with respect to the relevant exchanges (Compl. ¶ 27), and that she was privy to information concerning Rockwell's financial status and the viability of the Noah's business model that effectively contradicted representations being made to plaintiffs. Plaintiffs further allege that O'Toole Enterprises, of which O'Toole is the principal, received commissions from the exchange transactions earned by others, with no apparent connection to O'Toole's company.  Compl. ¶ 38.  Finally, plaintiffs allege that "O'Toole was privy to substantial communications between Rockwell and EWI;" "had access to information at EWI, including Noah's financial statements from which it was evident that Noah was in poor financial condition," and that "O'Toole communicated frequently with Hamrick regarding the business relationship with Rockwell and the Noah TIC program as . . . it was the primary source of income for the couple."  Compl. ¶ 78.

Again, plaintiffs' allegations concerning O'Toole's
involvement in the purported scheme are inferentially meagre.
At this stage, they are sufficient to preclude dismissal, but
will no doubt be revisited again on summary judgment.

    (b)  <u>Timothy Burger</u>

The same can be said for plaintiffs' allegations concerning
the involvement of defendant Timothy Burger in the purported
scheme: while meagre, they barely suffice to preclude Burger's
dismissal at this stage.

Defendants argue plaintiffs' claims against Burger are
insufficient because they fail to allege specifics about
Burger's alleged actions or omissions.  However, plaintiffs
allege that Burger, who has worked as a Section 1031 advisor for
EWI since 2013, provided them with advisory services with
respect to the relevant exchanges (Compl. ¶¶ 27, 42), and
executed certain documents in furtherance of the exchanges
(Compl. ¶¶ 35, 47).  Plaintiffs also allege (somewhat vaguely)
that Burger, along with Hamrick "made false and misleading
representations or omitted [material] information concerning the
actual value of the TIC interests, the historic[] operating
experience of the Noah's event venues, and the nature of the
risk[s] associated with the TIC securities."  Compl. ¶ 71.
Finally, plaintiffs allege that Burger "communicated with HDC on

multiple occasions," and "reinforced the misrepresentations
contained in the [Rockwell] sales materials."  Compl. ¶ 73.
Again, those factual allegations are sufficient to preclude
Burger's dismissal at this early stage.

    (c)  <u>Chris Brown</u>

    As defendants point out, plaintiffs allege only that Brown
worked for EWI.  There is no allegation suggesting that he was
in any way involved in plaintiffs' exchange transactions.  The
only factual allegations concerning Brown's involvement are
impermissible "group pleading" allegations in which Brown's name
is listed along with those of all the other defendants;
plaintiffs allege no actions taken by Brown that relate in any
way to the transactions at issue.

    Defendants' motion to dismiss all claims against defendant
Chris Brown is granted.

    (d)  <u>EWES</u>

    Finally, defendants say that plaintiffs' claims against
EWES must be dismissed, since the only allegations against EWES
(beyond jurisdictional) are that: (1) EWES shares officers, or
members, with EWI; and (1) EWES shares an address with EWI.
Accordingly, defendants argue, because no culpable conduct is
attributed to EWES, and no allegations would establish that EWES

is liable for the conduct of other defendants, plaintiffs have
not stated a cognizable claim against EWES.

Plaintiffs argue in response that they have sufficiently
alleged that EWES and EWI worked together to facilitate the
Section 1031 exchanges at issue.  They further argue that they
have alleged that EWES may be vicariously liable for the
wrongful acts of its officers and employees, Hamrick and
O'Toole, since both are managers of EWES, "were acting within
the scope of their employment when the tortious acts and other
wrongful acts were undertaken," and "had a duty to exercise
reasonable case in hiring, supervising, and retaining its
employees to prevent the foreseeable conduct alleged herein."
Pls.' Mem. in Opp. to Mot. to Dismiss at 12.  Finally,
plaintiffs say that their allegations would support piercing the
corporate veil between EWI and EWES "to the extent these
entities were used collectively to perpetrate the securities
fraud and other wrongful acts" against the plaintiffs.  Id.

As a preliminary matter, plaintiffs' decision to
collectively refer to both EWI and EWES as "EWI" does not
address EWES's alleged role in the Section 1031 exchanges in the
slightest.  HDC's contract to provide Section 1031 exchange
services was with EWI, not EWES, and the complaint does not
assert that EWES was involved in the transactions at issue.

Moreover, because HDC contracted with EWI to provide exchange services, it makes little sense that the individual defendants would be acting as agents and employees of EWES when they "induced HDC to make unsuitable investments as part of an intended 1031 exchange."  Compl. ¶ 18.

Nor have plaintiffs adequately pled a basis upon which to pierce the corporate veil.  By referring to EWES and EWI collectively as "EWI," plaintiffs seemingly seek to create one entity, or a "single enterprise" out of two distinct companies. Plaintiffs allege that EWES and EWI shared an address, as well as officers or members.  Compl. ¶ 3.  But, as the New Hampshire Supreme has held, "the fact that one person controls two corporations is not sufficient to make the two corporations and the controlling stockholder the same person under the law." Vill. Press, Inc. v. Stephen Edward Co., 120 N.H. 469, 471 (1980) (citations omitted).  And, critically, "in New Hampshire, corporate veil piercing and the alter-ego doctrine have been used to do one thing only: hold the owners of corporations liable for the debts of the corporations they own."  Michnovez v. Blair, LLC, 795 F. Supp. 2d 177, 186 (D.N.H. 2011). Plaintiffs point to no authority "for the proposition that New Hampshire would, if presented with the question, adopt a single-enterprise theory . . . , under which an entity other than an

34

owner of a corporation could be held liable for that
corporation's conduct by means of veil piercing." Id.

Even if the court were to assume that New Hampshire courts
would allow piercing in such instances, and – following the lead
of the New Hampshire Supreme Court in Mbahaba v. Morgan, 163
N.H. 561, 568 (2012) – assume but not decide that managers of a
limited liability corporation may be held liable on a veil-
piercing theory in an appropriate case – plaintiffs' claim still
falls short.  To support veil piercing under New Hampshire law,
a plaintiff must assert factual allegations sufficient to
plausibly establish that the EWES corporate form was used "to
promote an injustice or fraud" on the plaintiff.  Norwood Grp.,
Inc. v. Phillips, 149 N.H. 722, 724 (2003).  "Lack of sufficient
separation between an LLC and a member may be shown by, among
other things, demonstrating that the member exercised 'sole and
exclusive control over'" the LLC."  Fujifilm N. Am. Corp. v. M&R
Printing Equip., Inc., No. 20-CV-492-LM, 2021 WL 722861, at *7
(D.N.H. Feb. 24, 2021) (quoting Antaeus Enters., Inc. v.
Davidson, 774 F. Supp. 2d 409, 416 (D.N.H. 2011)).  Simply put,
plaintiffs' argument is unpersuasive because the complaint is
lacking any factual allegations that suggest EWES members were
using the EWES corporate form to perpetuate fraud in the context
of the claims in this case.

Along those lines, plaintiffs' reliance on G.E. Mobile Water, Inc. v Red Desert Reclamation, LLC, 6 F. Supp. 3d 195 (D.N.H. 2014), is misplaced.  In finding that plaintiffs had successfully stated a claim for piercing the corporate veil, the court did note that the companies "operate out of the same business address," and that the companies' "officers hold titles with both" companies, but those allegations were not dispositive.  The court also noted that plaintiffs had alleged the company was the "parent corporation" of Red Desert (the company they wished to pierce), the parent company had offered to pay a portion of Red Desert's debts ("permitting an inference of the intermingling of corporate funds;" and the parent company's officers had played the primary role in negotiating the contract, and managing plaintiffs' concerns regarding contract performance, which, the court stated, "permits an inference that [the parent company] in fact controlled the project and was using Red Desert's corporate form to not only insulate itself from liability but to commit an injustice." GE Mobile Water, Inc. v. Red Desert Reclamation, LLC, 6 F. Supp. 3d 195, 203 (D.N.H. 2014).  Finally, plaintiff had alleged that Red Desert was severely undercapitalized. Id.  Such critical allegations concerning the relationship between EWES and EWE are entirely absent from plaintiffs' complaint in this case.

Defendants' motion to dismiss plaintiffs' claims against EWES is granted.

(3)  <u>Claims asserted by 1031 Realty</u>

Defendants next argue that 1031 Realty's claims against the defendants must be dismissed because defendants did not provide exchange services to 1031 Realty, nor was 1031 Realty a party to the Section 1031 agreements.  Plaintiffs respond that 1031 Realty is a limited liability company created for the purpose of holding title to Noah's Birmingham, and that John Esserian, the president of HDC, is the sole member of 1031 Realty.  According to plaintiffs, HDC's claims against the defendants transferred to 1031 Realty when HDC transferred its interest to 1031 Realty. And, plaintiffs argue, defendants' misrepresentations concerning the Rockwell investments continued after HDC's interest was transferred to 1031 Realty.

Defendants cite no authority in support of their argument, which is woefully undeveloped.  In any event, plaintiffs have sufficiently alleged that defendants' misrepresentations continued after HDC's interest was transferred to 1031 Realty. Defendant' motion to dismiss all claims by 1031 Realty is therefore denied, on grounds that the argument is undeveloped and unpersuasive.

(4)  <u>Economic Loss Doctrine</u>

Defendants contend that the economic loss doctrine bars plaintiffs' nine tort claims, since the damages plaintiffs seek to recover are purely economic (lost principal, investment gains, etc.), which are not recoverable in tort.

Generally speaking, the economic loss doctrine operates "to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." <u>Plourde Sand & Gravel Co. v. JGI Eastern, Inc.</u>, 154 N.H. 791, 794 (2007).  <u>See also Wyle v. Lees</u>, 162 N.H. 406, 412 (2011) (noting that economic loss doctrine precludes claims that "merely relate to a breached promise to perform the terms of the contract or attempt to recharacterize a breach of contract claim as a negligent misrepresentation."). In other words, "[a] plaintiff cannot recover damages in tort for a negligently performed contract." <u>Androscoggin Valley Regl. Refuse Disposal Dist. v. R.H. White Constr. Co.</u>, No. 15-cv-434-LM, 2017 WL 1906612 at *4 (D.N.H. May 8, 2017).  Thus, the economic loss "doctrine precludes a harmed contracting party from recovering in tort unless he is owed an independent duty of care outside the terms of the contract." <u>Mentis Sciences, Inc. v. Pittsburg Networks, LLC</u>, 173 N.H. 584, 593 (2020) (internal quotations omitted).

However, the "economic loss doctrine is not absolute."
<u>Gasparik v. Fed. Nat'l Mortg. Ass'n</u>, No. 16-CV-147-AJ, 2016 WL
7015672, at *3 (D.N.H. Dec. 1, 2016).  As the New Hampshire
Supreme Court has noted, "economic loss recovery may be
permitted . . . where there is: (1) a 'special relationship'
between the plaintiff and the defendant that creates a duty owed
by the defendant; or (2) a negligent misrepresentation made by a
defendant who is in the business of supplying information."
<u>Wyle v. Lees</u>, 162 N.H. 406, 410 (2011).  Plaintiffs argue that
both exceptions apply, as they have sufficiently alleged (1) a
"special relationship" existed between the parties (since
defendants were acting in a fiduciary role, and as a QI for
HDC); and (2) that defendants made negligent misrepresentations
upon which plaintiffs reasonably relied to their detriment.

The facts as pled fall within one or both of the exceptions
to the economic loss doctrine.  However, whether the economic
loss doctrine applies cannot be fully resolved in the context of
this motion to dismiss, given unresolved factual disputes
relating to the nature of the relationship between the parties.

<u>"Special Relationship" Exception</u>

"A special relationship for purposes of the exception is
similar to the duty 'owed by a promisor to a third-party
beneficiary,' that is, 'if the contract is so expressed as to

give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of making the contract.'" Johnson v. Cap. Offset Co., No. 11-CV-459-JD, 2013 WL 2250145, at *3 (D.N.H. May 22, 2013) (quoting Plourde, 154 N.H. at 796.  "The special relationship exception 'hinge[s] upon the presence of an independent duty owed to the plaintiff because of the nature of the 'special relationship' with the defendant.'" Id. (quoting Plourde, 154 N.H. at 796–97).

Defendants' argument that a QI should be considered a "special relationship" under New Hampshire law is somewhat sparse, and the court declines to wade into the issue without the benefit of adequate briefing from both sides.  But, plaintiffs have also alleged that defendants were acting in a fiduciary capacity, given the long-standing relationship between the parties, the advice regarding different exchange opportunities, and that defendants took on an overall advisory role when they suggested (or marketed) the Rockwell properties, providing sales information concerning the Rockwell properties, and dissuading HDC from purchasing alternative, likely more appropriate, exchange properties.  The described relationship and advisory activity created a duty on the part of defendants

that was separate and apart from their contractual duties under the QI contracts, plaintiffs say.

As mentioned, whether defendants did, by their actions, assume a duty beyond their contractual obligations is a factual issue.  It cannot, therefore, be decided at the motion to dismiss stage.  Defendants are, of course, free to raise the argument at summary judgment with the benefit of a fully developed record.

Negligent Misrepresentation Exception

Turning to the negligent misrepresentation exception, the New Hampshire Supreme Court explained in Plourde that a plaintiff may invoke the exception against a defendant:

> who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

154 N.H. at 799 (quoting Restatement (Second) of Torts § 552(1)).

Plaintiffs have sufficiently alleged that such circumstances existed here: that defendants, in the course of

their employment, supplied false information to plaintiffs
regarding the Noah properties.  Those purported
misrepresentations are outside the subject matter of the
contracts between the parties, which concern the parties'
obligations relating to the Section 1031 exchange (i.e., that
EWI will acquire the property being sold by HDC, transfer HDC's
property to its new owner, acquire a replacement property, and
transfer the replacement property to HDC).  See Schaefer v.
Indymac Mortg. Servs., 731 F.3d 98, 109 (1st Cir. 2013) ("the
negligent misrepresentation exception reaches only those
representations that precede the formation of the contract or
that relate to a transaction other than the one that constitutes
the subject of the contract.").

Whether defendants can be considered "in the business of
supplying information," however, is a closer question.  Given
the early stage of this suit, the court declines to rule now, as
a matter of law, that defendants were not a "supplier of
information," without the benefit of a fully developed record.
The complaint can support a claim that defendants took on other
roles beyond that described in the contract for QI services.

Defendants' motion to dismiss plaintiffs' tort claims
because they are barred by the economic loss doctrine is denied
without prejudice.  Defendants are of course free to raise the

issue at summary judgment, should the fully developed record
support their position.

### (5)   Individual Claims

Finally, Defendants have moved to dismiss each of
plaintiffs' claims for failure to state a cognizable claim.

#### (a)   Count One – Negligence

To state a claim for negligence under New Hampshire law, a
plaintiff must allege facts that show the defendant owed him a
duty, breached that duty, and that the breach caused the
plaintiff harm.  Yager v. Clauson, 169 N.H. 1, 5, 139 A.3d 1127
(2016).  Defendants argue that plaintiffs have not stated a
negligence claim because they have not alleged that defendants
had a duty to plaintiffs outside their obligations under the
contracts.

"Whether a duty exists in a particular case is a question
of law."  Bloom v. Casella Constr., Inc., 172 N.H. 625, 627
(2019).  A duty generally arises from a relationship between the
plaintiff and defendant.  Sisson v. Jankowski, 148 N.H. 503,
505, 809 A.2d 1265 (2002) (citations omitted).  "When charged
with determining whether a duty exists in a particular case,
[the court] necessarily encounter[s] the broader, more
fundamental question of whether the plaintiff's interests are

entitled to legal protection against the defendant's conduct."
Walls v. Oxford Mgmt. Co., 137 N.H. 653, 657 (1993) (internal
quotations omitted).

As discussed supra, plaintiffs have alleged that defendants
took on extracontractual advisory and fiduciary roles during the
Section 1031 exchange process by "suggesting the Rockwell
Properties, sending sales information, following up on the
opportunity, and dissuading HDC from [investing in] an
alternative property."  Pls.' Obj. to Mot. to Dismiss at 27.  By
taking on such a role, plaintiffs argue, an extracontractual
duty arose.  In addition, plaintiffs argue that, as real estate
agents, O'Toole and Hamrick had a duty arising from N.H. Rev.
Stat. Ann. 331-A, as well as a fiduciary duty that arose from
their status as QI.  Finally, plaintiffs argue that, because
defendants made a partial disclosure of fees earned from the
Rockwell transaction, they had a duty to make a full and
accurate disclosure, since partial disclosure gives rise to a
duty to fully disclose when the "partial disclosure, standing
alone, is deceptive."  Id. at 28 (quoting Manchester Mfg.
Acquisitions, 802 F. Supp. at 602-03).

Given the early stage of the litigation, plaintiffs have
sufficiently alleged that defendants owed extracontractual
duties to plaintiffs.  Cf., Sintros v. Hamon, 148 N.H. 478, 482,

810 A.2d 553, 556 (2002) (listing circumstances that might
suggest a "special relationship" between insurance agent and
insured, including "express agreement, long established
relationships of entrustment in which the agent clearly
appreciates the duty of giving advice, additional compensation
apart from premium payments, and the agent holding out as a
highly-skilled expert coupled with reliance by the insured.").
But, because the existence of a "special relationship" is fact-
specific, as discussed in the context of defendants' argument
concerning the economic loss doctrine, the nature of that duty
cannot be determined in the context of this motion to dismiss
without the benefit of a fully developed record.  See Sintros,
148 N.H. at 483 ("The existence of a special relationship
requires a fact-specific inquiry.") (citations omitted).

Defendants' motion to dismiss plaintiffs' negligence claim
is therefore denied at this juncture.

(b)  Count Two: Negligent Misrepresentation

Under New Hampshire law, "[i]t is the duty of one who
volunteers information to another not having equal knowledge,
with the intention that he will act upon it, to exercise
reasonable care to verify the truth of his statements before
making them." Wyle v. Lees, 162 N.H. 406, 413 (2011) (citations
omitted).  Accordingly, the elements of a claim for negligent

misrepresentation are a "negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Wyle v. Lees, 162 N.H. 406, 413 (2011) (citing Snierson v. Scruton, 145 N.H. 73, (2000)).

Defendants argue that plaintiffs have not sufficiently alleged that they relied on the statements allegedly made by the defendants.  Defendants say that, at least with respect to the Noah's Birmingham exchange, the complaint does not allege that HDC relied on defendants' statements, since Esserian decided to invest in the TIC interests only after "HDC's preferred replacement properties did not become available within the 180-day closing window."  Defs.' Mot. to Dismiss at 24 (quoting Compl. ¶ 33).

Plaintiffs counter that they have sufficiently alleged justifiable reliance, as the complaint alleges that the defendants' misrepresentations were material to plaintiffs' decision to invest (and remain invested) in the Rockwell properties.  Plaintiffs further argue that their agreement to invest in Noah's Birmingham after their preferred replacement properties were unavailable is "not an indication that Plaintiffs did not rely on Defendants' misrepresentation," but rather suggests that "Defendants used the time pressure of a 1031 exchange . . . to lure investors into unsuitable

46

investments in order to earn commissions."  Pls.' Obj. to Mot.
to Dismiss at 29.

Plaintiffs have the better argument here, having alleged
that HDC would not have invested in the Rockwell properties in
the absence of defendants' purported misrepresentations
concerning, inter alia, the short-term suitability of the
investments, the expected rate of return, Noah's business model
"working perfectly," Compl. ¶34, the actual value of the
Rockwell properties, and the nature of the risks relating to the
investments.  While plaintiffs' allegations of reliance are
perhaps conclusory, the facts underlying those allegations are
better addressed in the context of a summary judgment motion.
Accordingly, defendants' motion to dismiss plaintiffs' negligent
misrepresentation claim is denied.

(c)   Count Three: Negligent Hiring/Supervision/Retention

Defendants say that plaintiffs' negligent
hiring/supervision/retention claim should be dismissed because:
(1)"it is unclear which employees [the complaint] refers to[,]
and it lacks any facts regarding O'Toole Enterprises and EWI's
knowledge of the unfitness of these unnamed employees;" and
(2) plaintiffs allege that it was O'Toole Enterprises and EWI's
principals (not employees) that allegedly committed the tortious
conduct, and therefore, it was not the allegedly negligent

47

hiring, supervision or retention of employees that caused plaintiffs' injury.  Defs.' Mot. to Dismiss at 18.

The court agrees.  Plaintiffs' allegations in support of its negligent hiring/supervision/retention claim are vague, and conclusory.  Plaintiffs fail to allege how EWI "knew or should have known" that its employees would commit the complained of acts, or explain how additional supervision or training might have avoided the risk.  See Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) ("the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").  Moreover, defendants are correct in pointing out that the majority of the "employees" accused of perpetuating the alleged scheme (O'Toole and Hamrick) are not employees, but principals of the company.

Accordingly, defendants' motion to dismiss plaintiffs' claim for negligent hiring/supervision/retention is granted.

(d)  Count Four: Unjust Enrichment

In support of their motion to dismiss plaintiffs' claim for unjust enrichment, defendants argue that the complaint does not allege that defendants received an "unconscionable" benefit. The referral fees upon which plaintiffs' unjust enrichment claim

is based, defendants say, were disclosed in the agreements governing both Section 1031 exchanges.

Plaintiffs respond that defendants received commissions from plaintiffs' purchases of the Rockwell properties that ranged from approximately $151,964.53 to $303,929.07, and defendants' misrepresentations and omissions were motivated by the prospect of earning those commissions.  Plaintiffs say that defendants "knew they were misrepresenting their commissions structure by not disclosing the amount and nature of their commissions and actually taking steps to hide the commissions." Pls.' Obj. to Mot. to Dismiss at 30.  Under such circumstances, plaintiffs contend, it "would be unconscionable" to allow defendants the benefit of the commissions they received.

"The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity." Est. of Mortner v. Thompson, 170 N.H. 625, 631 (2018) (quoting Pella Windows and Doors v. Faraci, 133 N.H. 585, 586 (1990)).  "To state a claim, a plaintiff must sufficiently allege that the defendant was enriched at the plaintiff's expense through either: (1) wrongful acts; or (2) 'passive acceptance of a benefit that would be unconscionable to retain.'" Id. (quoting Kowalski v. Cedars of Portsmouth Condo. Assoc., 146 N.H. 130, 133 (2001).  "A defendant's retention of a

benefit is 'unconscionable' when it 'affronts the sense of justice, decency, or reasonableness' or is '[s]hockingly unjust or unfair.'"  Id. at 632 (quoting Black's Law Dictionary 1757 (10th ed. 2014)).

Plaintiffs have alleged that, motivated by the prospect of earning commissions, rather than any duty they might have had to plaintiffs, defendants misrepresented the stability and profitability of the Rockwell investments.  The nature and extent of defendants' disclosure of those commissions is a question of fact that cannot be resolved at this juncture.  And, whether the commissions paid by the sellers were accepted in breach of a fiduciary duty owed plaintiffs presents issues of fact as well.  Accordingly, defendants' motion to dismiss plaintiffs' unjust enrichment claim for failure to state a claim is denied.

    (e)  Count Five: Breach of Fiduciary Duty

Under New Hampshire law, "[a] fiduciary relationship has been defined as a comprehensive term and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed."  Brzica v. Trustees of Dartmouth Coll., 147 N.H. 443, 447 (2002) (quoting Lash v. Cheshire County Savings Bank, 124 N.H. 435, 438 (1984)).  "[A] confidential relation exists between two persons when one has gained the

confidence of the other and purports to act or advise with the other's interest in mind." Id. (quoting Cornwell v. Cornwell, 116 N.H. 205, 209 (1976).

Defendants contend that plaintiffs have not sufficiently alleged predicate facts establishing a fiduciary relationship between the parties, especially concerning the selection and vetting of replacement Section 1031 properties.  Furthermore, defendants say, their role as a QI for the Section 1031 exchanges cannot be the basis for the creation of a fiduciary relationship, since the contract between the parties specifies that EWI was not acting as a broker for the exchanges, would not provide legal or tax advice for the transactions, and that HDC should consult with appropriate professionals concerning the transactions.

Again, whether a fiduciary relationship did, in fact, exist between the parties, and the nature of that fiduciary relationship, cannot be determined on this motion to dismiss without the benefit of a developed record.  However, plaintiffs' allegations are sufficient, at this stage, to survive defendants' motion to dismiss the claim.  See Cardigan Mountain Sch. v. New Hampshire Ins. Co., 787 F.3d 82, 88 (1st Cir. 2015) ("factual allegations need only be enough to nudge the claim across the line from conceivable to plausible, thus raising a

reasonable expectation that discovery will reveal evidence of
the lost policy.") (internal quotations omitted).  Plaintiffs
allege that, as a result of their long-standing business
relationship with defendants, they placed their confidence in
defendants (who were experts concerning Section 1031 exchanges),
and believed defendants to be acting in plaintiffs' best
interests in recommending the Rockwell properties as
investments.  See Compl. ¶¶ 25, 72, 115, 118.  Plaintiffs
further allege that defendants had access to knowledge about the
Rockwell investments that plaintiffs did not have (such as
information about the financial performance of Noah), and that
defendants breached their fiduciary duties by "concealing and/or
failing to alert" plaintiffs to the misappropriation of funds by
Rockwell and Noah from the Rockwell properties.  See Compl.
¶¶ 118-119.  Construing all reasonable inferences in plaintiffs'
favor, as the court must, the complaint alleges a sufficient
factual basis to state a claim for breach of fiduciary duty.

(f)  Count Six: Blue Sky Violations

Defendants move to dismiss plaintiffs' claim under the
Massachusetts Uniform Securities Act, Section 410, Mass. Gen. L.
c. 110A § 410, because, they contend, plaintiffs fail to
adequately allege material omissions or misrepresentations
establishing that any of the defendants knew or should have

known that any omission or representation was untrue.

Plaintiffs respond that defendants' knowledge may be inferred

from allegations that defendants had a close relationship with

Noah and Rockwell, and had assisted in preparing documents used

to sell the Rockwell properties, as well as plaintiffs'

allegations concerning defendants' representations regarding

their investigations into the strength of the Rockwell

investments.

To state a claim under the Massachusetts Uniform Securities

Act, Section 410(a), a plaintiff "must show that (1) Defendants

offered or sold securities in Massachusetts; (2) by making an

untrue statement of, or omitting, any material fact; (3)

Plaintiff did not know of the untruth or omission; and

(4) Defendants knew or should have known of the untruth or

omission." Mass. Mut. Life Ins. Co. v. Residential Funding Co.,

LLC, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (citing Marram v.

Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1026 (Mass.

2004)).  A plaintiff need not "prove scienter, negligence, or

reliance because the law is designed to hold the seller liable

for inaccurate disclosure or nondisclosure of material

information." Miller Inv. Tr. v. Morgan Stanley & Co. Inc., 879

F. Supp. 2d 158, 164 (D. Mass. 2012).  Moreover, "the buyer's

sophistication is irrelevant to a MUSA claim, and the buyer has

no duty to investigate or verify a statement's accuracy." Mass.
Mut. Life Ins. Co. v. Residential Funding Co., LLC, 843 F. Supp.
2d. at 200 (citing Marran, 809 N.E. at 1027).

As discussed supra (in the context of defendant' arguments
concerning Fed. R. Civ. P. 9(b)'s pleading requirements and
scienter), plaintiffs have sufficiently alleged that defendants
knew, or should have known, that the purported representations
were untrue and omissions were material.  Nothing more need be
said.  Defendants' motion to dismiss count six of plaintiffs'
complaint is denied.

    (g)  Count Seven: Violation of N.H. Real Estate Practice
        Act

Plaintiffs have also asserted a claim for purported
violations of the New Hampshire Real Estate Practice Act, N.H.
Rev. Stat. Ann. ("RSA") 331-A.  Plaintiffs allege that
defendants O'Toole and Hamrick have violated, inter alia,
several of the Act's provisions as set forth in N.H. RSA 331-
A:25-f, N.H. RSA 331-A:25-d, N.H. RSA 331-A:25-a, and N.H. RSA
331-A:26.

Defendants assert that plaintiffs' claim should be
dismissed because they fail to plausibly allege that defendants
were acting as real estate professionals during the transaction.
Defendants point out that plaintiffs have not claimed that

defendants represented to any party that they were acting as
real estate professionals, or that they performed any work on
the Section 1031 exchanges in such capacity.  Instead,
defendants argue, plaintiffs' allegations that defendants were
acting as real estate professionals is "based solely on the fact
that [defendants] have real estate licenses and advertise that
fact on their website."  Defs.' Mot. to Dismiss at 24.

Plaintiffs' claim for violation of the New Hampshire Real
Estate Practice Act, N.H. Rev. Stat. Ann. 331-A, is dismissed,
but not for the reasons argued by defendants.  In a recent New
Hampshire Supreme Court case, Lacasse v. Majewski, No. 2019-
0646, 2020 WL 2306572, at *1 (N.H. Apr. 2, 2020), the court
affirmed a trial court's decision that N.H. Rev. Stat. Ann. 331-
A:26 "does not create a private cause of action."  The court
noted that, "the legislature intended [RSA chapter 331-A] to
have no effect outside the ethical, licensing, and disciplinary
confines of the business.'"  Id. (quoting Snierson v. Scruton,
145 N.H. 73, 82 (2000)).  See also Finlay Com. Real Est., Inc.
v. Paino, 133 N.H. 4, 8, 573 A.2d 125, 127 (1990) ("The
standards set forth in RSA chapter 331-A meant to guide the
Commission in promulgating the various rules required to
effectuate its purpose are entirely directed at the internal
policies and procedures necessary to maintain the integrity of

the real estate business."). Plaintiffs fail to provide any explanation as to why the Supreme Court's ruling should not apply to their claim asserted here.

Defendants' motion to dismiss count seven, plaintiffs' claim for violations of New Hampshire's Real Estate Practice Act, is granted.

(h)  Count Eight: Civil Conspiracy

"New Hampshire courts define civil conspiracy as 'a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means.'"  Sykes v. RBS Citizens, N.A., 2 F. Supp. 3d 128, 138 (D.N.H. 2014) (quoting Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987) (further quotations omitted)).  The elements of a cause of action for civil conspiracy are "'(1) two or more persons (including corporations); (2) an object to be accomplished (i.e. an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'"  Id. (quoting Jay Edwards, 130 N.H. at 47 (emphasis omitted)).

Defendants argue that plaintiffs' civil conspiracy claim should be dismissed because the alleged conspiracy between defendants is not supported with any specificity with regards to an agreement.  Defendants say that, because the plaintiffs have not sufficiently pled the existence of an agreement, Count Eight should be dismissed.

Plaintiffs argue in response that they have alleged that:

    a.    defendants were close business associates with Noah and Rockwell;

    b.    with Noah and Rockwell, defendants jointly coordinated a scheme to induce the plaintiffs' investment in their Ponzi scheme in order to receive commissions of three to six percent from the sale of Rockwell properties;

    c.    in furtherance of their scheme, defendants participated in the creation of marketing materials that they disseminated to plaintiffs that contain multiple misrepresentations and material omissions;

    d.    in furtherance of their scheme, defendants represented that the Rockwell properties were profitable, operated independently, and that "revenues from the individual venues were more than sufficient to pay the guaranteed lease payments from Noah's," pls.' obj. to mot. to dismiss at 32; and

    e.    in furtherance of their scheme, commissions were paid to defendants by Rockwell, deposited in an account owned by O'Toole Enterprises in order to hide those commissions from the plaintiffs.

These allegations, plaintiffs say, are sufficient to support a claim for civil conspiracy.

Giving plaintiffs the benefit of all reasonable inferences at this stage, the complaint adequately alleges an agreement between the defendants and the Rockwell/Noah associates to engage in a scheme to defraud the plaintiffs by, among other things, misrepresenting the value and profitability of the Rockwell properties, the economic relationship between the individual Noah event spaces, and defendants' receipt of substantial commissions from Rockwell for the sale of its properties to plaintiffs under false pretenses. Plaintiffs also allege the existence of a "finder's" arrangement between Rockwell and several of the defendants, which resulted in commissions paid to those defendants, and the depositing of those commissions into an account with O'Toole Enterprises. The existence of such an arrangement suggests an agreement between the defendants and the Rockwell individuals and entities to place properties with defendants' Section 1031 clients, without regard to suitability, in the pursuit of mutual monetary gain.

Accordingly, while weak, plaintiffs' allegations adequately plead the essential elements and sufficient inferences to

support a viable claim for civil conspiracy.  Defendants' motion
to dismiss that claim must therefore be denied.

    (i)   Count Nine: Violation of N.H. Consumer Protection Act

New Hampshire's Consumer Protection Act, N.H. Rev. Stat.
Ann. § 358-A:2, provides that "[i]t shall be unlawful for any
person to use any unfair method of competition or any unfair or
deceptive act or practice in the conduct of any trade or
commerce within this state."  The Act lists several "actions
that fall within its prohibition, but that is not an exhaustive
list of prohibited methods, acts, or practices."  Moulton v.
Bane, No. 14-CV-265-JD, 2016 WL 1091093, at *11 (D.N.H. Mar. 21,
2016) (citing ACAS Acquisitions (Precitech) Inc. v. Hobert, 155
N.H. 381, 402 (2007)).  "If the challenged conduct is not listed
in RSA 358-A:2, to be actionable it 'must attain a level of
rascality that would raise an eyebrow of someone inured to the
rough and tumble of the world of commerce.'"  Moulton, 2016 WL
1091093, at *11 (quoting Axenics, Inc. v. Turner Constr. Co.,
164 N.H. 659, 675 (2013)).

In support of their CPA claim, plaintiffs allege that
defendants violated the CPA by making false representations and
concealing material facts regarding the Rockwell properties, and
by promoting "their services as trustworthy and reliable when

they were in fact intentionally or recklessly defrauding their
clients."  Compl. ¶¶ 157-158.  Defendants urge dismissal of
plaintiffs' CPA claim, arguing that plaintiffs have merely
recited conduct prohibited by the statute as grounds for
recovery, which, defendants say, is insufficient to support a
claim under the statute because plaintiffs have not alleged
conduct rising to the level of "rascality" the statute requires.

The court disagrees.  Plaintiffs have plausibly pled that
defendants' alleged conduct constitutes an "unfair or deceptive
act or practice."  RSA 358-A:2.  This is not a case where
plaintiffs have merely alleged broken promises, or selfish
bargaining.  See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.,
158 N.H. 363, 370 (2009) ("selfish bargaining and business
dealings will not be enough to justify a claim for damages"
under the Consumer Protection Act) (quoting Barrows v. Boles,
141 N.H. 382, 390 (1996)); see also Romano v. Site Acquisitions,
Inc., No. 15-CV-384-AJ, 2016 WL 50471, at *3 (D.N.H. Jan. 4,
2016) ("Although the plaintiffs' allegations are serious,
misrepresentations ... [and] broken promises alone do not rise
to the level of rascality where successful [CPA] claims dwell.")
(internal quotations omitted).  Instead, plaintiffs allege that,
while purportedly acting in plaintiffs' best interests,
defendants conspired to deliberately provide fraudulent

information (and to withhold material information) to induce
plaintiffs' purchase of two Rockwell properties, so that
defendants could receive commissions from Rockwell on the
plaintiffs' purchase of the properties.  Those alleged acts
attain "a level of rascality that would raise an eyebrow of
someone inured to the rough and tumble of the world of
commerce." Beer v. Bennett, 160 N.H. 166, 171 (2010) (affirming
trial court's finding that defendant violated CPA where "he made
representations, knowing he lacked sufficient knowledge to
substantiate them, to induce the plaintiff's purchase.")  See
also Snierson v. Scruton, 145 N.H. 73, 81 (2000), as modified
(Nov. 22, 2000) (allegations supported a claim of unfair or
deceptive trade practices under the Consumer Protection Act,
where plaintiffs alleged: (1) [defendant] misrepresented
material facts; (2) she did so to induce the plaintiffs to enter
into the real estate contract; (3) [defendant] had reason to
know that she did not have sufficient knowledge to make such
statements and, therefore, made such statements with reckless
disregard for their truth or correctness; (4) the plaintiffs
believed and relied on the representations; and (5) [defendants]
did not give the [plaintiffs] reason to believe that the said
representations were not true") (internal quotations omitted).

Defendants' motion to dismiss plaintiffs' Consumer Protection Act claim is denied.

(j)  <u>Count Ten: Aiding and Abetting</u>

Defendants move to dismiss Count Ten, plaintiffs aiding and abetting claim because, they say, plaintiffs have not alleged facts that would, if proven, establish that any defendant knew of the others' purported breach of duty, and knowingly assisted the breach of that duty.  Plaintiffs respond that they have alleged that defendants worked together to promote their scheme, and used O'Toole Enterprises to receive and hide the payment of commissions from Rockwell related to the transactions.  The use of O'Toole Enterprises, plaintiffs say, "manifests the Defendants' scheme to hide the payment of commissions from the Plaintiffs."  Pls. Obj. to Mot. to Dismiss at 32 (quoting Compl. ¶ 76).

However, neither party addresses a necessary preliminary matter:  whether the New Hampshire Supreme Court would recognize the tort of aiding and abetting breach of fiduciary duties, fraud, and conversion.  The few courts that have addressed the issue have concluded that New Hampshire "would recognize the tort of aiding and abetting breach of fiduciary duty based on the Restatement (Second) of Torts § 876(b)."  <u>HayJo S.A. de CV v. Sponge-Jet, Inc.</u>, No. 14-CV-196-JD, 2015 WL 9459918, at *4

(D.N.H. Dec. 23, 2015) (citing Invest Almaz v. Temple-Inland
Forest Prods. Corp., 243 F.3d 57, 82-83 (1st Cir. 1994); Tamposi
v. Denby, 974 F. Supp. 2d 51, 61-62 (D. Mass. 2013); In re Felt
Mfg. Co., Inc., 371 B.R. 589, 615 (Bankr. N.H. 2007)).  However,
the court declines to weigh in without the benefit of adequate
briefing by the parties.  Accordingly, defendants' motion to
dismiss plaintiffs' aiding and abetting claim is denied without
prejudice, pending additional briefing as to whether the New
Hampshire Supreme Court would recognize the tort.

The court observes that plaintiffs' aiding and abetting
claim is, word-for-word, duplicative of their conspiracy claim.
Compare Compl. ¶¶ 146-153 and Compl. ¶¶ 160-167.  In other
words, plaintiffs have seemingly pled conspiracy twice.  While
Fed. R. Civ. P. 8(d)(2) allows a party to assert alternative
claims based on the same facts, or alternative theories of
liability, this practice may not provide "fair notice to
Defendants regarding what claim Plaintiffs are actually
pursuing."  DiTucci v. Ashby, 2020 WL 1249627, at *10.  The
court urges plaintiffs to "consider whether all of [their]
claims are equally meritorious and whether it is in [their] best
interest to take a more focused approach on [their] theories of
relief."  Pigulski v. Johnson & Johnson, Inc., No. 18-CV-1061-
LM, 2019 WL 2582540, at *4 (D.N.H. June 24, 2019) (citing

Batterman v. Leahy, 544 F.3d 370, 373 (1st Cir. 2008) ("A
kitchen-sink complaint, unless dismissed for some central
jurisdictional or pleading flaw, is likely to be hard slogging,
requiring that counts be worked through one by one.")).

    (k)  Count 12: Conversion

Finally, defendants have moved to dismiss plaintiffs' claim
for conversion, arguing that the complaint fails to allege that
defendants converted any property outside of an unspecified
amount of money, and "money can be the subject of conversion
only when it can be described, identified, or segregated in the
manner similar to a specific chattel."  Defs.' Mot. To Dismiss
at 23.

In response, plaintiffs contend that they have alleged that
defendants "wrongfully converted a sum of money, capable of
being identified," specifically, plaintiffs' investment in the
Rockwell properties ($2,678,309.09 in Noah's Birmingham, and
$2,387,175.29 in Noah's Overland Park).  Pls. Obj. to Mot. to
Dismiss at 33.  According to plaintiffs, defendants wrongfully
converted between three to six percent of those investments (or
approximately $151,964.53 – $303,929.07, in total), which were
misappropriated to provide the defendants' secret commission,
pursuant to defendants' scheme with Rockwell.

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Garod v. Steiner Law Office, PLLC, 170 N.H. 1, 6-7 (2017) (further quotations omitted).  The New Hampshire Supreme Court has found that money can be a proper subject of a conversion claim.  See, e.g., Giles v. Merritt, 59 N.H. 325 (1879) ("The appropriation of the money to her own use by the defendant was a conversion ...."); see also Broadus v. Infor, Inc., No. 18-CV-1079-JD, 2019 WL 1992953, at *5 (D.N.H. May 6, 2019).

Indeed, the exact issue has been previously addressed by courts in the District of Utah and Vermont, involving the same facts at issue here.  See DiTucci v. Ashby, 2020 WL 1249627, at *9; Oak Hill Mgmt., Inc. v. Edmund & Wheeler, Inc., No. 2:20-CV-124, 2022 WL 797394, at *10 (D. Vt. Mar. 16, 2022).  Both courts found that plaintiffs had sufficiently stated a conversion claim.  See DiTucci, 2020 WL 1249627 at *9 ("The complaint specifically states that the E&W Defendants secretly skimmed off a portion of Plaintiffs' investment to pay themselves a commission.  If, as alleged, the E&W Defendants were redirecting part of Plaintiffs' funds for themselves, then the E&W Defendants may be liable for conversion. Accordingly, this claim

has been properly pled.") (internal citations omitted); <u>Oak Hill</u> <u>Mgmt., Inc.</u>, 2022 WL 797394 at *10 ("The Court therefore joins another court in finding that the facts in this case, taken as true, support a conversion claim." (citing <u>DiTucci</u>, 2020 WL 1249627 at *9)).

Defendants' motion to dismiss plaintiffs' conversion claim is denied.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED** in part, and **GRANTED** in part, as set forth herein. All of plaintiffs' claims against defendants EWES and Chris Brown are necessarily dismissed for failure to state a claim, as are plaintiffs' claims for negligent hiring/supervision/retention, and for violation of the New Hampshire Real Estate Practice Act.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 29, 2022

cc:  Counsel of Record